# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 01-3733

———————

United States of America,        *
                                             *

    Plaintiff - Appellee,      *

                                             *   Appeal from the United States
v.                                     *   District Court for the
                                           *   Western District of Missouri.

Timothy Michael Walsh,      *

                                           *

    Defendant - Appellant.    *

———————

Submitted:  April 17, 2002

Filed:  July 29, 2002

———————

Before WOLLMAN, BEAM and LOKEN, Circuit Judges.

———————

LOKEN, Circuit Judge.

After police officers seized drug manufacturing equipment and a firearm from his rented quarters, Timothy Michael Walsh was indicted for attempting to manufacture methamphetamine and for being a felon in possession of a firearm. The district court[1] denied his suppression motion, and Walsh entered a conditional guilty

———————

[1]The HONORABLE GARY A. FENNER, United States District Judge for the Western District of Missouri, who adopted the Report and Recommendation of the HONORABLE JAMES C. ENGLAND, United States Magistrate Judge for the Western District of Missouri.

plea to the firearm count. He now appeals the district court's suppression motion ruling, arguing that warrantless entries into his bedroom and storage shed tainted the subsequent, more thorough warrant searches. "We examine the factual findings underlying the district court's denial of the motion to suppress for clear error and review de novo the ultimate question of whether the Fourth Amendment has been violated." United States v. Clayton, 210 F.3d 841, 845 (8th Cir. 2000). We affirm.

On November 24, 2000, Springfield, Missouri, narcotics investigator Robert McPhail received an anonymous tip that a white male and female were operating a methamphetamine lab at 2815 East Cherry, the home of Lisa Davis. Officers Kevin Cantrell and Chad White were dispatched to investigate, arriving around 7:30 p.m. on a rainy evening. Officer White positioned himself in the driveway near the carport at the rear of the house while Officer Cantrell knocked on a side door. Despite (or perhaps because of) loud noise and music emanating from the house, there was no answer to Cantrell's knock. By apparent coincidence, Thomas Belcher emerged from the back porch and agreed to accompany Cantrell to the front door, where he knocked again. This time, Davis answered and invited Cantrell to come in out of the rain. Walsh joined the group from the rear of the house. There were also four young children in the house, three of Ms. Davis's children and a neighbor's child.

Belcher and Davis identified themselves to Officer Cantrell, and Davis consented to a search of the home, except for a back bedroom and a storage shed off the carport, areas rented by Walsh. Walsh identified himself as his brother, Brian Walsh, and produced a driver's license in that name, but refused to consent to a search of his bedroom or the storage shed. When the dispatcher advised Cantrell of an outstanding arrest warrant for Brian Walsh on drug trafficking charges, Cantrell handcuffed and arrested Walsh. After securing Walsh, Officer Cantrell searched the areas of the house authorized by Davis's consent. He found no evidence of crime but

noted a surveillance camera in a bedroom window aimed at the storage shed. He also opened the door to Walsh's bedroom and looked inside, testifying at the suppression hearing that this was done to complete a protective security sweep of the entire house.

Cantrell then exited the house and rejoined Officer White in the carport area. He found trash and empty cans of starter fluid on the back porch, an extension cord running from an outlet by the back door to the storage shed, white residue inside a blender pitcher, two-liter soda bottles (which he described as acid generators), and a strong smell of ether -- which he had noticed when he first arrived but which was stronger near the storage shed. At this point, at least one hour after arriving at the house, Officer Cantrell opened the door to the storage shed and used his flashlight to view its contents. Cantrell explained at the suppression hearing:

> After seeing those things [outside the shed], knowing what we were here for, what we were checking, the strong odor of ether, I felt that we needed to check this [shed] just to make sure, to see what was in there. At the time I didn't know if another person may have been in there hiding or what the situation was.

> \* \* \* \* \*

> Based on what we had seen and because of the people that were in the area, the people I was dealing with, I was responsible [for], I determined for our safety and theirs, we need to open that door and check inside to see what was in there and that's what we did. . . . I opened the door and looked inside. I saw another acid generator. This one with a rubber hose coming out the top of it, several starter fluid cans which have been punched and an active, white mist hanging in the air. . . . I told Officer White that we needed to vacate that area right there and we did. We moved -- shut the door, moved back away from it and contacted the dispatcher to let [the Narcotics Enforcement Team] know that we have found what we believed to be an active lab so they could respond.

Having secured the premises, the police arrested Ms. Davis, as the owner of premises on which an active methamphetamine lab had been found, transported Walsh and Davis to the police station for booking, removed the children to the custody of the neighbor child's mother, and released Thomas Belcher. Around 11:30 p.m., narcotics investigator McPhail arrived at the scene and was briefed by Officer Cantrell. Officer McPhail opened the door to the shed, looked in, and promptly closed the door. He saw a modified storage tank for ammonia, an acid generator, an open bottle of rock salt, and a white mist in the air. When asked why he looked in the shed, McPhail testified:

> Well, I wanted to -- there's no point in holding the house for three to five hours if there's not -- if the elements of the charge aren't there. I wanted to make sure that there was no heat source that could further complicate the chemical situation. . . . At the point when I looked in the door, it looked to me like possibly an active meth lab. . . . Due to the fog in the area, I did not have an APR air mask, so I didn't want to enter any further. I did not see a heat source . . . . I did not have the proper safety equipment to enter and check.

After spending ten to fifteen minutes at the scene, Officer McPhail left the premises to obtain a search warrant, a process that took about three hours. He returned to the scene around 3:00 a.m. and spent the next few hours executing the search warrant. McPhail found the firearm, ammunition, and other evidence in Walsh's bedroom and equipment for manufacturing methamphetamine in the storage shed and the carport area. Walsh moved to suppress this evidence on the ground that it was seized in a non-consensual search that violated his Fourth Amendment rights as occupant of the bedroom and storage shed.

At the suppression hearing, the defense vigorously cross-examined officers Cantrell and McPhail and presented the testimony of five witnesses, including Davis and Belcher but not Walsh. Conceding the officers had probable cause to obtain a

valid search warrant, the defense attacked the officers' testimony as to the time line for their various actions at the Davis/Walsh residence. The point of this defense was to establish that the officers gathered the evidence in a warrantless search *before* obtaining the warrant and preparing a search warrant return and an inventory of the property they seized.

The district court rejected this defense and denied the motion to suppress. The court expressly credited the testimony of officers Cantrell and McPhail, and it found the defense witnesses not credible. The court found the warrantless protective sweep of Walsh's bedroom was justified because there was no evidence contradicting the officers' testimony "that they looked in the room to ensure that there were no other individuals in the house who might pose a security threat." Finally, the court found that exigent circumstances justified the officers' decision to look in the storage shed before obtaining a search warrant:

> The court is convinced that the officers reasonably believed that there was a safety concern that required them to step into the shed for a short period of time to ensure that there was not a methamphetamine lab in operation and to ensure that no one was hiding in the shed. Attempting to obtain a search warrant before securing the premises by way of proper investigative techniques could have resulted in a disastrous outcome. The fact that Officer McPhail did a cursory search of the storage shed after Officer Cantrell had done the same can also be excused under the exigent circumstances exception to the warrant requirement. Officer McPhail had special training with methamphetamine laboratories. Additionally, he testified that he wanted to check to see if there was a heat source for the chemicals that might make the risk of explosion more imminent. . . . [T]he court finds that officers had adequate probable cause to believe that a methamphetamine laboratory was operating inside the storage shed, and that the government has met its burden of establishing that exigent circumstances existed justifying the warrantless entry. United States v. Vance, 53 F.3d 220, 222 (8th Cir. 1995).

On appeal, Walsh first argues that Officer Cantrell's warrantless entry into his bedroom was an unconstitutional search. "[E]xcept in certain carefully defined classes of cases a search of private property without proper consent is unreasonable unless it has been authorized by a search warrant." Camara v. Municipal Court, 387 U.S. 523, 528-29 (1967). One exception to the warrant requirement is illustrated by Maryland v. Buie, 494 U.S. 325, 337 (1990) -- police officers who are validly in a home to execute an arrest warrant may make a limited protective sweep if they have "a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." See also United States v. Boyd, 180 F.3d 967, 975 (8th Cir. 1999). This type of search is limited to protecting the arresting officers when that is justified by the circumstances. It is "not a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found." Buie, 494 U.S. at 335.

The government argues that Officer Cantrell's quick look into Walsh's bedroom was justified by this exception to the Fourth Amendment's warrant requirement. Walsh argues it was not a valid protective sweep because it occurred too long after his arrest to be considered incident to the arrest. In the district court, this suppression issue was significant, because the firearm was found in Walsh's bedroom and the defense theory was that the entire search was conducted before Officer McPhail obtained a search warrant. But the district court rejected the factual premise of that theory, crediting the officers' testimony that Cantrell's quick look into the bedroom yielded no evidence. As this finding was not clearly erroneous, we need not review the court's protective sweep ruling. The search warrant was not tainted by the cursory inspection of Walsh's bedroom because the warrant application made no mention of the sweep or of anything seen during the sweep. See United States v. Hogan, 38 F.3d 1148, 1151 (10th Cir. 1994), cert. denied, 514 U.S. 1008 (1995). Therefore, the evidence found in the bedroom during the warrant search was admissible. See Segura v. United States, 468 U.S. 796, 805 (1984); United States v. Warren, 16 F.3d 247, 253 (8th Cir. 1994).

Walsh next argues that the quick looks into the storage shed by officers Cantrell and McPhail were unconstitutional warrantless searches. The district court found, however, that these cursory searches were justified by the exigent circumstances exception to the warrant requirement. "A warrantless search is reasonable when justified by both probable cause and exigent circumstances." United States v. Parris, 17 F.3d 227, 229 (8th Cir.), cert. denied, 511 U.S. 1077 (1994). In this case, the issue of probable cause was conceded by Walsh in the district court, so the question is whether exigent circumstances justified the officers' decision to look in the shed before they obtained a search warrant. As the district court recognized, the government bears the burden of proving exigent circumstances. The district court's ultimate determination of exigent circumstances is reviewed de novo. See United States v. Cooper, 168 F.3d 336, 339 (8th Cir. 1999).

"Our court has consistently considered safety factors in determining whether exigent circumstances existed." United States v. Boettger, 71 F.3d 1410, 1415 (8th Cir. 1995) (warrantless entry into apartment after an explosion justified by exigent circumstances); see Mincey v. Arizona, 437 U.S. 385, 392-93 (1978); Michigan v. Tyler, 436 U.S. 499, 509-10 (1978). Walsh argues that the officers' actions were consistent with conducting a criminal investigation, not dealing with a public safety emergency -- Officer Cantrell waited over an hour after initially smelling ether in the driveway, and he failed to alert the neighbors and evacuate the occupants of the house, including several young children, after discovering what he believed to be an active methamphetamine lab. In addition, it took Officer McPhail over two hours to arrive on the scene after being informed that an active methamphetamine laboratory had apparently been discovered.

Though these facts are relevant to the exigent circumstances inquiry, we conclude the district court's exigent circumstances determination must be upheld. The potential hazards of methamphetamine manufacture are well documented, and numerous cases have upheld limited warrantless searches by police officers who had

probable cause to believe they had uncovered an on-going methamphetamine manufacturing operation.  See United States v. Wilson, 865 F.2d 215, 217 (9th Cir. 1989);  United States v. Echegoyen, 799 F.2d 1271, 1278-79 (9th Cir. 1986); United States v. Brock, 667 F.2d 1311, 1318 (9th Cir. 1982), cert. denied, 460 U.S. 1022 (1983); United States v. Williams, 630 F.2d 1322, 1326-27 (9th Cir.), cert. denied sub nom. Murchison v. United States, 449 U.S. 865 (1980) (PCP lab); United States v. Erb, 596 F.2d 412, 418 (10th Cir.), cert. denied, 444 U.S. 848 (1979).  See also United States v. Dick, 173 F. Supp. 2d 765, 771 (E.D. Tenn. 2001) (methamphetamine lab in apartment complex warranted sentence enhancement under U.S.S.G. § 2D1.1(b)(6) because it "created a substantial risk of harm to human life"). Here, the strong smell of ether and the equipment and residue found in the carport area suggested on-going manufacture in the shed.  Officer Cantrell could not be certain no one was hiding (or worse yet, lying unconscious) in the shed, and Officer McPhail was justified in verifying that no untended heat source was creating an imminent risk of fire or the explosion of volatile chemicals.  As in United States v. Antwine, 873 F.2d 1144, 1147 (8th Cir. 1989), "the scope of [the] warrantless search did not exceed what was necessitated by the exigency."  Officer Cantrell looked around the shed from the entrance and then shut the door. Officer McPhail confirmed there seemed to be no imminent risk of fire or explosion and then obtained a warrant before investigating the lab more thoroughly and eliminating its less immediate threat to public safety. Thus, viewed in their totality, the officers' actions complied with the Fourth Amendment standard of reasonableness.

Finally, Walsh contends that all the officers acted in bad faith, misrepresenting the time line to cover up the fact that thorough searches were conducted and all the evidence seized prior to Officer McPhail obtaining a warrant.  The district court expressly rejected this fact-based defense, crediting the testimony of officers Cantrell and McPhail and finding conflicting testimony by defense witnesses not credible.  "A district court's determination as to the credibility of a witness is virtually unreviewable on appeal."  United States v. Heath, 58 F.3d 1271, 1275 (8th Cir.), cert.

<u>denied</u>, 516 U.S. 892 (1995).  After careful review of the suppression hearing record, we conclude the district court's credibility findings are well supported.

The judgment of the district court is affirmed.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.