# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-2277

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Plaintiff-Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the Western |
| | * | District of Missouri. |
| Alfonso D. Gill | * | |
| | * | |
| Defendant-Appellant. | * | |

_____

Submitted: November 18, 2003
Filed: January 20, 2004    (Corrected 02/25/04)

_____

Before RILEY, RICHARD S. ARNOLD, and MELLOY, Circuit Judges.

_____

MELLOY, Circuit Judge.

Defendant-Appellant Alfonso D. Gill appeals the district court's[1] adverse determination that exigent circumstances justified a preliminary warrantless search of his residence and that evidence found in plain view during the preliminary search provided probable cause for a later-issued search warrant.  We affirm.

_____

[1]The Honorable Fernando J. Gaitan, Jr., United States District Judge for the Western District of Missouri.

I.

On October 29, 2002, at around 10:00 p.m., two police officers responded to a suspicious person report regarding a man who had jumped from an apartment window into a raised flower bed and was attempting to climb back up the side of the building. The officers who responded to the call arrived at the apartment and found muddy footprints on a sidewalk and wall below an open window. Lights were on inside the apartment and the blinds were raised. The officers then saw Gill, who matched the description from the report and had mud on his clothing and shoes. The officers asked Gill if he had fallen from the window, if the apartment was his, and if he was locked out. Gill did not respond, but instead avoided the police and walked around them into the street. The officers then asked Gill his name, asked if everything was okay, and asked if he had taken drugs. Gill circled in the street, became belligerent, and yelled "leave me alone, don't talk to me." At about this time, a third officer arrived. When the officers approached Gill, he ran to a nearby gas station, grabbed a bar code scanning device, and aimed it at the officers in an attempted standoff. Eventually, a fourth officer arrived at the gas station. All four officers were required to overpower and subdue Gill and place him in handcuffs.

After subduing Gill, the officers asked for his name and address. At first, Gill did not respond, but eventually he told officers that his name was Gill. He gave the officers an address different from the address of the apartment with the muddy footprints and open window. After hearing the name Gill, one of the officers remembered him as Alfonso Gill from earlier encounters and incarcerations. A records check revealed that Gill's last known address was the nearby apartment with the open window. The officers described Gill as "very disoriented," noted that he demonstrated extraordinary strength, and noted that he sweated profusely even though it was not warm. Based on these conditions, the officers suspected that Gill was under the influence of PCP. In addition to the mud on Gill's clothes and shoes, officers noted that he had blood on the back of his shirt but that the source of the blood was not apparent.

Some of the officers returned to the apartment. By this time, a police sergeant had arrived and, when the officers told her what had occurred, she told the officers to look in the open window "to make certain there wasn't a body lying in the middle of the floor or something of that nature." When officers stood on the flower planter but could not reach high enough to see in the window, the sergeant instructed officers to call for the fire department to bring a ladder. When the ladder arrived, an officer set its base on the sidewalk outside the open window, set its other end against the building, and climbed up to look into the open window. Without entering the apartment, the officer saw a handgun lying in the middle of the room. He reported this fact to the sergeant who instructed officers to "clear the residence to make certain there wasn't someone hiding or a body lying in the apartment or evidence of some other crime in plain view."

The officer atop the ladder entered the apartment first and saw an assault rifle lying beneath the window sill. He warned the other officers not to step on it as they entered. They observed a stack of currency and coins on the kitchen counter, pots with a white residue on the stove, a triple-beam scale protruding from an open cabinet, and a stack of rubber gloves in another open cabinet. Upon learning of these discoveries, the sergeant instructed the officers to leave the items alone and obtain a search warrant.

The officers obtained a search warrant and seized the items described above. A federal grand jury returned an indictment charging Gill as a felon in possession of firearms in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Gill moved to suppress all evidence obtained from the apartment. A magistrate judge[2] held an evidentiary hearing on Gill's motion to suppress and recommended that the motion be denied. He found that the circumstances surrounding Gill's capture, including the unexplained blood on Gill's shirt, his apparently drug-influenced actions, and the

---

[2]The Honorable John T. Maughmer, Magistrate Judge for the United States District Court for the Western District of Missouri.

suspicion of foul play at the apartment, provided exigent circumstances that excused the limited, warrantless acts of placing a ladder against the building and peering through the open apartment window. He also determined that, after officers observed the handgun, exigent circumstances justified the warrantless sweep to secure the apartment and ensure no victims were present.

Gill did not object to any findings of historical fact set forth in the report and recommendation. However, he did specifically object to the omission of certain facts he believed to be material. In particular, he noted that officers entered the apartment between thirty and sixty minutes after they first arrived on the scene, directed a flashlight into an open cupboard, entered the apartment in a manner inconsistent with a sincere belief that someone inside needed assistance (i.e., waited and proceeded slowly through the window rather than forcibly and quickly entering through the door), and failed to pursue various other courses of action that were available to them (e.g., failed to seek the assistance of the building's security guard to gather information about the apartment's occupants and gain access to the building). In addition, Gill objected to the ultimate legal conclusion contained in the report and recommendation, namely, that a perceived exigency excused the warrantless sweep of the apartment.

The district court adopted the report and recommendation in its entirety. Gill subsequently entered a conditional guilty plea but reserved his right to appeal the suppression ruling. We affirm.

II.

"We review the district court's findings of historical fact for clear error, but the ultimate determination of whether the facts as found constitute exigent circumstances is reviewed de novo." United States v. Kuenstler, 325 F.3d 1015, 1021 (8th Cir. 2003) (citing Ornelas v. United States, 517 U.S. 690, 696 (1996)); see also United States v. Walsh, 299 F.3d 729, 734 (8th Cir. 2002) ("The district court's ultimate

-4-

determination of exigent circumstances is reviewed de novo.").  Our review of the district court's ultimate determination of exigent circumstances is an objective one, "'focusing on what a reasonable, experienced police officer would believe.'" Kuenstler, 325 F.3d at 1021 (quoting In re Sealed Case 96-3167, 153 F.3d 759, 766 (D.C. Cir. 1998)).

Before considering the ultimate determination of whether the facts objectively demonstrated an exigency that justified the officers' actions, we must address Gill's factual challenges.  Gill's first factual challenge relates to the timing of the officers' entry into the apartment.  The district court properly rejected Gill's arguments in this regard.  Officers arrived on the scene, encountered Gill, and pursued and subdued him.  Suspicions concerning foul play arose during this time and grew as officers observed Gill's actions, demeanor, flight, and resistance.  When officers saw the blood on Gill's shirt, these concerns were  heightened.  Only then did officers return to the apartment and attempt to look in the open window.  It is clear, then, that delay attributable to the pursuit and capture of Gill preceded the officers' appreciation of an exigency.  Accordingly, this portion of the delay is irrelevant to our analysis.

Later, when officers had decided it was necessary to look through the open window, they stood on a raised flower bed, could not see in the window, and called the fire department.  The remainder of the delay, about four or five minutes, was attributable to the wait for a ladder.  Gill argues that officers could have sought help from the apartment's front-door security guard to reach, at a minimum, the interior hallway of the apartment building, or possibly to gather information about the apartment's occupants.  Gill also argues that the officers' failure to call an ambulance belies the sincerity of their claims regarding concern for possible crime victims.  In short, Gill identifies various courses of action that officers might have taken that he believes would better support the officers' claims to exigency.  He fails, however, to explain how these proposed courses of action would have led to quicker entry.  More importantly, he fails to demonstrate clear error in the district court's findings.

Although the district court did not explicitly address the delays, the district court's findings enjoy support in the record, set forth a detailed account of the events that transpired, and fully account for the delay of which Gill complains.

Next Gill argues that an officer's testimony at the evidentiary hearing was inconsistent with an earlier report the officer wrote regarding the incident. We disagree. The officer's initial report merely stated that officers called the fire department so they could look in the window because the window was open and they did not know if a crime had occurred. At the hearing one officer testified, "[the sergeant] advised then to attempt to at least look through the window and make sure there was not like a body laying in the middle of the floor, since we had no idea what was going on and the person we had in custody didn't want to tell us what was happening." Another officer testified:

> One of the reasons, if nothing else, we wanted to determine if there was a crime inside, and if there was no crime inside we were going to secure the window so nobody else could get in the apartment. . . . Our immediate response was to assure that there was nobody else inside, there was no crime had taken place, that nobody was injured inside as a result of a crime, because our initial dispatch incident was consistent with the possibility of somebody burglarizing the apartment, because he gave us a false address initially. So somebody jumping out the window could have possibly been committing a crime. His actions were consistent with somebody committing a crime possibly, so we wanted to determine that there was nobody else inside that was the victim of a crime, or was still part of a crime.

Gill argues, in essence, that we must reject the officers' testimony from the suppression hearing as not credible because it either contradicts, or falsely embellishes upon, the earlier report. We think it is clear that the officers' testimony expanded upon, rather than contradicted, the content of the initial report. The statement of uncertainty regarding whether a crime had occurred is consistent with

concern over possible victims. It is not, as argued by Gill, merely evidence of an intent to investigate. The magistrate judge and the district court found the officers' subsequent testimony credible. Finding no contradiction between the report and the testimony, we defer to the district court's credibility determination and its reliance on the hearing testimony. Walsh, 299 F.3d at 735 ("'A district court's determination as to the credibility of a witness is virtually unreviewable on appeal.'") (quoting United States v. Heath, 58 F.3d 1271, 1275 (8th Cir. 1995)).

Gill's final factual challenge relates to the district court's failure to address the undisputed testimony that one of the officers directed his flashlight into an open cupboard during the initial, warrantless sweep of the apartment. Gill argues that this action fell outside the scope of any search related to the possible presence of crime victims. Accordingly, he argues that the later-issued warrant and the evidence seized under the warrant are subject to exclusion as fruit of the poisonous tree. In addition, he argues that this officer's action supports the inference that the team of officers entered the apartment to search for evidence rather than victims.

We need not determine the propriety of the officer's actions in this regard because Gill failed to demonstrate that the officer's action tainted the warrant application or contributed to the government's charges in any manner. The handgun was visible from the window, and the assault rifle was in plain sight below the window. Other suspicious items were in plain view on the stove and/or protruding from open cabinets. These items provided sufficient probable cause for the subsequent warrant and supported the felon-in-possession charges that the government ultimately brought against Gill. In short, Gill failed to demonstrate that the subsequent warrant and the seized evidence were fruit of the search of the cupboard.

We also reject Gill's argument that the single officer's inspection of the cupboard proves that the team of officers entered to search for evidence rather than

victims. Here, as explained below, there was an objectively reasonable basis for believing there to be an exigency. Although the scope of officer investigation following entry may be relevant for inferring the purpose of entry, in this instance, any such inference is weak. Further, the district court rejected this inference when it accepted the testimony offered at the suppression hearing as credible. Accordingly, we will not disturb the district court's ruling.

Turning to the district court's legal conclusions, we need not decide whether officers conducted a Fourth Amendment search when they placed a ladder on the curtilage of the apartment building, leaned it against the exterior of the apartment building adjacent to Gill's open window, and used the ladder to look into the window. Instead, we may assume a search took place because, in this instance, we agree with the district court that exigent circumstances justified the limited intrusion. Officers found Gill muddied outside an apartment window from which he had reportedly jumped, but from which he may have fallen. He reportedly attempted to scale the side of the building. Footprints on the building corroborated this report. He evaded initial contact from the officers, became agitated when officers questioned him, appeared disoriented, circled in the street, ran from officers, brandished a bar code scanner as though it were a weapon, displayed sufficient strength to require four officers to subdue him, and, when questioned after his capture, provided an address different from the apartment with the open window (which was the address he last gave to police). Importantly, officers saw blood on his shirt but no apparent wounds. Given these circumstances, we agree with the district court that a reasonable, experienced officer was entitled to take the limited action of placing a ladder against the building to look through the open window to ensure that no one inside was in need of assistance. See Walsh, 299 F.3d at 734 (finding a warrantless intrusion permissible where it was commensurate in scope with the exigency at hand).

The sight of a handgun visible through the open window, coupled with the circumstances that justified peering through the window, changed the nature of the

exigency and magnified the necessity of a sweep. Accordingly, based on the expanded information and heightened concern that accompanied the presence of a gun in an already suspicious and dangerous setting, entry through the window and a plain sight search of the apartment were reasonable under the Fourth Amendment.

The judgment of the district court is affirmed.

_____