Earl W. LOY *v.* STATE of Arkansas

CA CR 03-205 195 S.W.3d 370

Court of Appeals of Arkansas
Opinion delivered October 13, 2004

[Rehearing denied November 17, 2004.[1]]

---

*Kathy L. Hall*, for appellant.

*Mike Beebe*, Att'y Gen., by: *Brent P. Gasper*, Ass't Att'y Gen., for appellee.

JOHN F. STROUD, Chief Judge. Appellant, Earl Loy, was convicted in a bench trial of possession of drug paraphernalia with intent to manufacture methamphetamine. He was sentenced to ninety months in the Arkansas Department of Correction, with sixty months suspended, and he was assessed $160 for court costs. On appeal, he argues that the trial court erred (1) when it denied his motion to suppress evidence in what he characterized as an illegal search and (2) in finding that there was sufficient evidence to support his conviction. We affirm appellant's conviction.

On the evening of October 29, 2001, Officers Samuel Spenser and Mark Willis of the Hot Springs Police Department went to 109 Boaz in Hot Springs to attempt to serve two misdemeanor arrest warrants on appellant. A U.S. Park Ranger had advised the officers that he had followed appellant to that address. Officer Spenser testified that he approached the residence, a mobile home, and knocked on the door inside the carport area. When he knocked on the door, a male voice just inside the door asked, "Who is it?" When Spenser identified himself as the police,

the voice inside told him "just a minute," and Spenser heard footsteps inside running toward the back of the trailer. Spenser advised Willis that he thought appellant was going to abscond, and Willis went to the back of the trailer.

Spenser knocked again, and when he was told "just a minute" a second time, he told the person inside that if he did not come out, he would bring the police dog out. At that time, appellant, whom Spenser recognized from a photo, opened the door, looked around, told the officer "just a minute" again, and closed the door. Spenser heard more footsteps inside, knocked again, and appellant answered the door again.

Spenser said that when appellant opened the door, a smell hit him immediately, his eyes and nose began to burn, and his lips and tongue began to go numb. He saw a large trash bag on the floor right inside the door with a lot of matches pouring out of it and some gloves lying on the floor, and he said that the air-conditioner was blowing full blast even though it was cold outside and the windows were open. Spenser testified that he turned to Willis and said, "meth," to which appellant replied, "You got a search warrant? You need a search warrant for that."

Spenser asked appellant who he was, and appellant told them that his name was Steve; however, both officers recognized appellant as the person for whom they had the arrest warrants, and they took him into custody. Spenser said that when they removed appellant, he also saw a syringe lying on the coffee table. The officers saw a female sitting at a table by the door who was identified as Nancy Lyon, and she told them that there was a female in the back. Willis did a sweep of the residence at that time.

On cross-examination, Spenser said that there was a door frame to the carport, but that he went inside that area and knocked on the trailer door. He said that the door on the outside of the carport was not a secure door.

Officer Willis's testimony corroborated that of Officer Spenser regarding how the officers approached the door and what appellant did as they were attempting to get him to open the door. After taking appellant into custody, Willis said that he noticed the female sitting at the kitchen table to the right of the door, and he saw the large bag of matches with the striker plates missing, a syringe on the coffee table, a large bag, and gloves in front of the bag. Due to the female's response that she thought someone else was in the residence, Willis walked through the trailer and found a man, Dana Ecker, in the bathroom, and another man, Michael

Howell, asleep in the bedroom, and he took those individuals outside, along with Nancy Lyon. Willis denied that he opened any cabinets or drawers.

Richard Norris, an investigator on the drug task force, testified that he arrived at the residence after Spenser and Willis had taken several people out of the residence. He noticed strong odors when he arrived that were a culmination of the odors he associated with meth labs. He also saw sitting on the front porch a large glass jar containing a red liquid and a dark sediment and a bucket that had a cloth filter on top containing gray crystals that appeared to him to be iodine crystals. He also saw the books of matches inside the front door.

Norris entered the residence to make sure that there were no items that could cause an explosion and to ventilate the residence by opening more windows. Norris also turned off the air conditioning; made sure that there were no open chemicals; and made sure that there were no open flames, open fires, or open heaters burning. When he walked to the back bedroom, he saw what appeared to be a hydrogen gas generator protruding from under the bed that was still putting off an acid vapor. He also found a female hiding under the bed, later identified as Paula George. After removing George, the residence was secured, and Norris applied for a nighttime search warrant, which was granted. The basis for it being a nighttime search warrant was, "The Affiant [Norris] states that the residence cannot be properly secured so as to not pose a danger to the community or anyone who might enter. The Affiant believes that exigent circumstances exist to warrant conducting the search during nighttime hours." The warrant was executed, and numerous items related to the manufacture of methamphetamine were found inside and outside the residence, as well as in the garbage of the residence.

Dana Ecker, the man found in the bathroom of the residence, testified that he knew appellant lived at the residence, but he did not know if appellant's landlord, Terry Floyd, was still living there at the time of appellant's arrest. He said that when he went to the residence that night, he did not knock on the carport door, but instead knocked on the trailer door. He said that he was there when Michael and Paula came in, but that he did not notice anything in their hands. He said that he was drinking that night, but that he did not smell anything unusual in the trailer, and he did not see anyone doing anything that he thought was illegal.

Jacqueline Reynolds testified that the residence had been her mother's, but that after she died, her brother, Terry Floyd, lived there. However, she said that Floyd had moved out in the summer of 2001, and that appellant was allowed to live there because he was working on some cars. She described the carport as a breezeway and said that it had not been screened in for over a year. She said that when she approached the trailer, she would go to the metal door on the trailer, not the one outside, because you could not knock on that one.

Carla Veazey testified that appellant lived at her deceased grandmother's house and that she had been there several days prior to appellant's arrest and found him cooking meth. She said that appellant promised to quit if she did not call the police, and she agreed.

The State rested, and appellant rested without calling any witnesses. Appellant made his arguments for his motion to suppress and his motion for directed verdict. The trial court took the issues under advisement and later issued a letter ruling denying appellant's motion to suppress and finding him guilty. Appellant now brings this appeal.

▮▮▮ Appellant contends that the trial judge erred in denying his motion for directed verdict. A directed-verdict motion is a challenge to the sufficiency of the evidence. *Fields v. State*, 349 Ark. 122, 76 S.W.3d 868 (2002). Although appellant's argument regarding the sufficiency of the evidence to support his conviction is his second point of appeal, preservation of his right against double jeopardy requires that the appellate court consider the challenge to the sufficiency of the evidence before alleged trial error is considered, even though the issue was not presented as the first issue on appeal. *Davis v. State*, 350 Ark. 22, 86 S.W.3d 872 (2002). When the sufficiency of the evidence is challenged, we consider only the evidence that supports the verdict, viewing the evidence in the light most favorable to the State. *Harris v. State*, 72 Ark. App. 227, 35 S.W.3d 819 (2000). The test is whether there is substantial evidence to support the verdict, which is evidence that is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or another. *Id.* Resolution of conflicts in testimony and assessment of witness credibility is for the fact-finder. *Id.*

Appellant contends that there was no evidence presented at trial that connected him with the drug paraphernalia found in the

residence, and therefore the State failed to prove that he exercised care, control, and management over the contraband or that he knew that it was in fact contraband. He argues that there was no testimony that he purchased any of the items seized, that he was seen holding or using any of the items seized, that his hands were stained, or that he appeared to be under the influence of methamphetamine. He further points to the fact that Investigator Norris, when asked what evidence connected appellant to the items in the home other than the fact that he lived there, replied that there was nothing.

In order to prove possession, it is not necessary to prove literal physical possession of contraband. *See Dodson v. State*, 341 Ark. 41, 14 S.W.3d 489 (2000). Contraband is deemed to be constructively possessed if the location of the contraband was under the dominion and control of the accused. *See Fultz v. State*, 333 Ark. 586, 972 S.W.2d 222 (1998). Although constructive possession may be implied when contraband is in the joint control of the accused and another person, joint occupancy, standing alone, is not sufficient to establish possession or joint possession. *Abshure v. State*, 79 Ark. App. 317, 87 S.W.3d 822 (2002). The State is also required to establish that (1) the accused exercised care, control, and management over the contraband, and (2) the accused knew the matter possessed was contraband. *Id.*

In the present case, appellant was unquestionably living in the residence at 109 Boaz. Although the landlord, Terry Floyd, had also lived in the trailer with appellant, the evidence indicated that Floyd had not been living at the residence for several weeks before appellant was arrested. When the officers arrived at the residence on the night of October 29, appellant was the person who repeatedly answered the door. When appellant finally opened the door, Officer Spenser smelled a strong chemical odor, his eyes and nose began to burn, and his lips and tongue started to go numb. Items associated with the manufacture of methamphetamine were found throughout the residence, outside the residence, and in the garbage outside the residence, and there were various stages of manufacturing occurring in different rooms of the residence. Furthermore, appellant acted in a suspicious manner when answering the officer's knock, opening and closing the door several times and looking around furtively. We hold that all of this evidence supports the finding by the trial court that appellant

possessed drug paraphernalia with the intent to manufacture methamphetamine, and we affirm on this point.

■ Appellant also contends that the trial court erred in denying his motion to suppress the evidence found in the house where he was residing. In his brief, appellant first argues that he had standing to contest the search. We hold that this is a moot point because the trial court determined that appellant had standing to contest the search. Additionally, appellant also argues (1) that Officers Spenser and Willis did not have probable cause to enter his home absent a valid search warrant; (2) that no exigent circumstances existed that would permit Officers Spenser or Willis or Investigator Norris to enter the house without a warrant; and (3) that the nighttime search did not comply with Rule 13.2 of the Arkansas Rules of Criminal Procedure.

■ In reviewing the denial of a motion to suppress, the appellate court conducts a *de novo* review based on the totality of the circumstances, reviewing findings of historical facts for clear error and determining whether those facts give rise to reasonable suspicion or probable cause, giving due weight to inferences drawn by the trial court. *Davis v. State*, 351 Ark. 406, 94 S.W.3d 892 (2003).

Appellant first argues that Officers Spenser and Willis improperly crossed the threshold of what the officers described as a carport to serve the valid arrest warrants because that was part of his residence and he had an expectation of privacy in that area. Appellant attempts to make much of the facts that there was an outside door, that there were posts at the corners, and that there was plywood on one end of that area. However, the testimony at trial was that the door could not be locked, that there was no longer screening around the area, and that you could walk between the wooden posts. Furthermore, both Dana Ecker and Jacqueline Reynolds testified that the trailer door, not the door on the outside of what the officers described as the carport, was the door that was approached and knocked upon when desiring entry into the trailer.

■ However, as the State points out, our supreme court, in *Benevidez v. State,* 352 Ark. 374, 379, 101 S.W.3d 242, 246 (2003) (*citing Payton v. New York*, 445 U.S. 573, 603 (1980)), held, "For Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited

authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." Although our supreme court has not explicitly held that a misdemeanor arrest warrant is sufficient for an officer's entrance into a home, the Eighth Circuit Court of Appeals, in *United States v. Clayton*, 210 F.3d 841, 843 (8th Cir. 2000), has held that this principle is applicable to both felony and misdemeanor arrest warrants. Furthermore, *Benevidez* explicitly allows officers to enter a dwelling if they have a valid arrest warrant and reason to believe that the suspect lives in the dwelling and is within it. Appellant makes no argument that the arrest warrants were not valid, and the officers testified that they had received information that appellant was inside the residence from a U.S. Park Ranger who had followed appellant to the residence. We hold that the officers' approach to the front door of the trailer was proper.

 Appellant also contends that Officers Spenser and Willis, and later Investigator Norris, had no probable cause to enter the residence without a search warrant, and that no exigent circumstances existed that would have allowed them to enter the residence without a warrant. Rule 14.3 of the Arkansas Rules of Criminal Procedure provides:

> An officer who has reasonable cause to believe that premises or a vehicle contain:
>
> (a) individuals in imminent danger of death or serious bodily harm; or
>
> (b) things imminently likely to burn, explode, or otherwise cause death, serious bodily harm, or substantial destruction of property; or
>
> (c) things subject to seizure which will cause or be used to cause death or serious bodily harm if their seizure is delayed;
>
> may, without a search warrant, enter and search such premises and vehicles, and the persons therein, to the extent reasonably necessary for the prevention of such death, bodily harm, or destruction.

Under this emergency exception, a warrantless entry into a residence may be upheld if the State proves that the officer had reasonable cause to believe that someone inside was in imminent danger of death or serious bodily harm. *Wofford v. State*, 330 Ark. 8, 952 S.W.2d 646 (1997).

■ We hold that the initial entry of Officers Spenser and Willis was justified under subsection (a) of Rule 14.3 of the Arkansas Rules of Criminal Procedure. Based upon what the officers saw and smelled when appellant opened the door, they believed that methamphetamine was being manufactured, which, based upon their knowledge of meth labs, would pose a threat of immediate serious bodily harm to anyone in the residence. The officers also had reason to believe that there were other persons in the residence based upon the footsteps that they heard when they first arrived and the fact that there was a female sitting at the table who said that she thought there was a female in the back of the house. We hold that this was proper in light of the circumstances.

■ With regard to Investigator Norris, under subsection (b) of Arkansas Rule of Criminal Procedure 14.3, entry into a residence is allowed where there is reasonable cause to believe that there are things imminently likely to burn, explode, or otherwise cause death, serious bodily harm, or substantial destruction of property. As the State points out, Norris was a member of the drug task force and was an expert in the field of clandestine meth labs, and he entered the residence to further secure the scene and ensure that there was no flame burning that could cause an explosion. In *United States v. Walsh*, 299 F.3d 729 (8th Cir. 2002), a second search by someone who had special training in meth labs was upheld when that search was for heat sources that could ignite. The Eighth Circuit held, "The potential hazards of methamphetamine manufacture are well documented, and numerous cases have upheld limited warrantless searches by police officers who had probable cause to believe they had uncovered an on-going methamphetamine manufacturing operation." *Id.* at 734. We hold that *Walsh* is instructive in the present case. Here, there was not only an odor, but the officers had seen evidence of meth production, and Investigator Norris was better-equipped as a member of the drug task force to insure that all possible sources of danger associated with the meth lab were contained. We find no error on this point.

Appellant's last point is that the nighttime search warrant did not comply with Rule 13.2 of the Arkansas Rules of Criminal Procedure. We must first note that based upon the trial judge's ruling contained in the abstract, which is the record on appeal, it did not appear that the trial judge ruled on the specific issue of the nighttime search. In *Romes v. State*, 356 Ark. 26, 144 S.W.3d 750

(2004), the supreme court held that when multiple issues were raised in a motion to suppress, the appellate court would not reach the merits of any argument not ruled upon by the trial court. However, upon reviewing the record, which this court can do to affirm, *see Turner v. State*, 59 Ark. App. 249, 956 S.W.2d 870 (1997), we discovered that after the trial judge issued his initial letter ruling, the public defender wrote back inquiring specifically about the nighttime search, and the trial judge then ruled upon that issue in an additional letter ruling denying appellant's motion to suppress on that basis as well.

 A factual basis for a nighttime search is required. *Stivers v. State*, 76 Ark. App. 117, 61 S.W.3d 204 (2001). A nighttime search warrant may only be granted under specific circumstances: the place to be searched is difficult of speedy access; the objects to be seized are in imminent danger of removal; the warrant can only be safely or successfully executed at nighttime or under circumstances the occurrence of which is difficult to predict with accuracy. Ark. R. Crim. P. 13.2(c). We hold that none of these exceptions are present here. The trailer was not difficult to access; with appellant arrested and the house secured, there was no imminent danger of removal; and there were no circumstances requiring the warrant to be executed at night.

 However, in *Crain v. State*, 78 Ark. App. 153, 79 S.W.3d 406 (2002), this court held that although there was no justification for a nighttime search, the search was permissible under the good-faith exception to the exclusionary rule. *See United States v. Leon*, 468 U.S. 897 (1984). Although this exception is not absolute, in that case it was applied because there was no evidence that the sheriff made material false statements or misrepresentations in his affidavit; there was no evidence that the judge issuing the warrant abandoned his neutral role; and the affidavit contained more than conclusory and boilerplate language. In determining whether the good-faith exception is applicable, this court must decide whether it "was objectively reasonable for a 'well-trained police officer' to conclude that the nighttime search was supported by probable cause." *Crain*, 78 Ark. App. at 157, 79 S.W.3d at 410. In *Crain*, this court, quoting *United States v. Martin*, 833 F.2d 752 (8th Cir. 1987), held:

> Although a police officer may not rely entirely on the magistrate's finding of probable cause, in cases where, as here, the courts cannot

agree on whether the affidavit is sufficient, it would be unfair to characterize the conduct of the executing officers as bad faith, particularly where there has been no material false statements or misrepresentations in the affidavit and where the officer is acting in good faith. When judges can look at the same affidavit and come to differing conclusions, a police officer's reliance on that affidavit must, therefore, be reasonable.

*Crain*, 78 Ark. App. at 158, 79 S.W.3d at 410.

In accordance with *Crain*, we must look to the totality of the circumstances, including what the affiant, Investigator Norris, knew but did not include in his affidavit. The affidavit included the following information in support of Norris's request for a nighttime search: there was a strong chemical odor emanating from the residence; there was a syringe lying on the coffee table; there was a bag of book matches with the striker plates removed just inside the front door; there was a glass jar on the front porch containing a red liquid with a gray sediment; there was a bucket on the front porch with a filter on top that contained suspected iodine crystals; and Norris observed an acetone bottle under the kitchen table, as well as the syringe on the coffee table, the book matches, and some coffee filters. In addition to the information contained in the affidavit, there was also evidence of evasive behavior by appellant when the officers first arrived at the residence to serve the arrest warrants; the air conditioner was on even though it was cold outside and the windows were open; and Norris found a hydrogen chloride gas generator protruding from under a bed that was still putting off an acid vapor.

As in *Crain,* in the present case there was no evidence that Investigator Norris made any material false statements or misrepresentations in his affidavit; there was no evidence that the judicial officer who signed the search warrant abandoned his detached and neutral role; and the affidavit provided evidence which could create disagreement among judges as to the existence of probable cause. Although we hold that a lack of manpower to secure the residence overnight to prevent a danger to anyone who entered is not a sound basis for a nighttime search warrant, nevertheless, we hold that the good-faith exception to the exclusionary rule is applicable in the present case because as in *Crain,* we believe that a reasonable, well-trained officer could have believed that a nighttime search was justified under the facts of this case.

Affirmed.

GLADWIN, BIRD, and CRABTREE, JJ., agree.

GRIFFEN and NEAL, JJ., dissent.

WENDELL L. GRIFFIN, Judge, dissenting. I, like the majority, agree that there were no circumstances in this case that justified a nighttime search. However, I join Judge Neal's dissenting opinion because I wholeheartedly disagree with the majority view that the search in this case was permissible under the good-faith exception to the exclusionary rule set forth in *United States v. Leon*, 468 U.S. 897 (1984).

The testimony by Investigator Richard Norris, which is cited in Judge Neal's dissenting opinion, demonstrates that the police knew they had no justification for conducting a nighttime search. Norris testified that *"to pay someone overtime to sit over there 'til the next day would have been a burden that we just—that we couldn't do at that time."*

In the face of that testimony, and absent any authority citing administrative convenience as a basis for allowing a search under the good-faith exception, the majority opinion declares that:

> Although we hold that a lack of manpower to secure the residence overnight to prevent a danger to anyone who entered is not a sound basis for a nighttime search warrant, nevertheless, we hold that the good-faith exception to the exclusionary rule is applicable in the present case because as in *Crain*, we believe that a reasonable, well-trained officer could have believed that a nighttime search was justified under the facts of this case.

The majority relies upon our court's decision in *Crain v. State*, 78 Ark. App. 153, 79 S.W.3d 406 (2002), in affirming the trial court, but this case is a far cry from even what was upheld in *Crain*. In that case, there was at least pre-search information above what we held was the "bare-bones" or boilerplate language of the affidavit submitted with the application for the search warrant. This case contains no similar proof. As I wrote in my dissenting opinion in *Crain, supra*, "our courts have resisted the temptation to lower the threshold for nighttime searches. This decision flies in the face of that reluctance." *Id.* at 162, 79 S.W.3d at 413.

The majority's rationale mocks the fundamental purpose of the Fourth Amendment and would leave the constitutional guarantee of freedom from unreasonable governmental intrusions

entirely dependent upon such factors as administrative convenience and the budget of law enforcement agencies, when it should turn on objective facts related to the challenged search. Our federal courts, and the United States Supreme Court in particular, recognize that the Fourth Amendment does not exist for the convenience of the government. *See McDonald v. U.S.*, 335 U.S. 451 (1948) (reversing conviction on Fourth Amendment grounds where no reason, except the inconvenience of the officers and delay in preparing papers and getting before a magistrate, explained the officer's failure to seek a search warrant). *See also United States v. Taylor*, 934 F.2d 218 (9th Cir. 1991) (noting that an individual's interest outranks government convenience in balancing Fourth Amendment interests).

Further, the right of privacy guaranteed by the Fourth Amendment is one of the fundamental values of our civilization, which means that it can neither be treated lightly nor trod upon. *Guzman v. State*, 283 Ark. 112, 117, 672 S.W.2d 656 (1984). It follows, then, that the protections guaranteed by the Fourth Amendment cannot be made to depend upon the changing standards of administrative convenience or fiscal solvency of law enforcement agencies. The danger with today's decision is that it appears to give judicial license for law enforcement officers to conduct a nighttime search based on an after-the-fact assertion that waiting for daylight "would have been a burden." The very idea runs counter to the notion of the Fourth Amendment guarantee as a "fundamental" guarantee.

Whatever else the good-faith exception to the exclusionary rule was intended to do, I categorically reject the idea that it justifies nighttime searches for reasons of administrative convenience. By affirming, the majority has used the good-faith exception to excuse conduct plainly prohibited by the Fourth Amendment. My respect for the civil liberties enshrined in the Bill of Rights compels me to respectfully dissent from this decision and the mischief that it will cause. Our decision in *Crain, supra*, went too far; I certainly am unwilling to extend it.

I am authorized to state that Judge NEAL joins in this dissent.

OLLY NEAL, Judge, dissenting. I respectfully dissent from the decision affirming the denial of appellant's motion to suppress because I do not believe that the good-faith exception applied. We use an objective standard when evaluating whether an officer acted in good faith. *See Carpenter v. State*, 36 Ark. App. 211,

821 S.W.2d 51 (1991). It has been said that "the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion stands at the very core of the Fourth Amendment." *Groh v. Ramirez*, 540 U.S. 551, 124 S. Ct. 1284, 1290 (2004) (quoting *Kyllo v. United States*, 533 U.S. 27 (2001)). Furthermore, it is the duty of the courts to be watchful for the constitutional rights of the citizen and against any stealthy encroachment thereon. *Boyd v. United States*, 116 U.S. 616, 635 (1886).

When asked why he did not wait to execute the search warrant between the hours of six a.m. and eight p.m., Investigator Norris replied:

> From the way that we were operating at that time, it wouldn't have been possible to — either a police officer or to pay someone overtime to sit over there 'til the next day would have been a burden that we just — that we couldn't do at that time. And without actually having somebody sitting there at the residence, you know, I can't [guarantee] security from anybody that comes up to want [sic] to get in there, to break in the residence, or anything like that.

The police department's lack of man power is not one of the enumerated reasons that justify a nighttime search. If I were to agree that the officers acted in good faith, I would be disregarding my duty to safe guard against the encroachment on the constitutional rights of our citizens. I am authorized to state that Judge Griffen joins in this dissent.