Daniel Scott CHROBAK *v.* STATE of Arkansas

CA CR 00-1101                                     58 S.W.3d 387

Court of Appeals of Arkansas
Division IV
Opinion delivered October 24, 2001

*Gregory E. Bryant,* for appellant.

*Mark Pryor,* Att'y Gen., by: *Valerie L. Kelly,* Ass't Att'y Gen., for appellee.

OLLY NEAL, Judge. A jury found appellant, Daniel Chrobak, guilty of rape, two counts of first-degree sexual abuse, and pandering or possessing visual medium depicting sexually explicit conduct involving a child. Appellant was sentenced to fifty years in the Arkansas Department of Correction. It is from this conviction that he appeals.

The events giving rise to this case began with an investigation by the New York State Attorney General's Office into the transmission and receipt of pornographic images of children via the Internet. In February of 1998, the office focused on an organized group of pedophiles known as the "NewsGroup." On July 27, 1998, an individual using the Internet address "Post@them.now" transmitted fourteen messages containing graphic files depicting minors engaged in sexually explicit conduct to the NewsGroup. The Internet service provider, Aristotle.net, confirmed that appellant, Dan Chrobak, had reserved that Internet address.

FBI Agent Jill Hill reviewed the fourteen messages whereupon she determined that the sexually explicit conduct that was exhibited involved children under the age of sixteen. On October 27, 1998, federal agents executed a search warrant on appellant's trailer and seized a videotape and a three-ring binder with photographs of children engaged in sexually explicit conduct. The video contained two scenes. The first scene involved appellant engaged in sexual relations with a female whose torso only was visible in the video. Based on her background and experience, Agent Hill determined that the female in the video was fourteen years of age or younger. Scene two shows a young female sleeping. In the video, appellant touches her buttocks.

The evidence was delivered to Pulaski County Detective Mark Winchester, whereupon he discovered that the young female was A.H., the daughter of K.S., appellant's co-worker. A.H. testified that she was "pretty sure" that she is the sleeping female whose face was not shown in the photograph because she recognized the pajamas and the 3D heart underwear as those she had previously worn. She also stated that she was less than fourteen years old when the events occurred. After further investigation, appellant was arrested and charged.

On appeal, appellant alleges that (1) the evidence taken from his home should have been suppressed, and that (2) there was insufficient evidence to convict him of rape.

### Sufficiency of the Evidence

Because of our consideration of prohibitions against double jeopardy, we review the sufficiency of the evidence prior to examining trial error. *Diemer v. State*, 340 Ark. 223, 9 S.W.3d 490 (2000); *see Jones v. State*, 336 Ark. 191, 984 S.W.2d 432 (1999); *Conner v.*

*State*, 334 Ark. 457, 982 S.W.2d 655 (1998). Appellant argues that because the alleged victim could not positively identify herself as the person portrayed in the video and was only able to identify a pair of pajamas as resembling those she had previously worn, there was insufficient evidence to convict him of rape.

■■ To preserve a challenge to the sufficiency of the evidence, a defendant must make a directed-verdict motion at the close of the State's case and renew it at the close of all the evidence. *King v. State*, 338 Ark. 591, 999 S.W.2d 183 (1999). However, when a defendant presents no evidence after a directed-verdict motion is made, further reliance on that motion is not waived. *Robinson v. State*, 317 Ark. 17, 875 S.W.2d 837 (1994). Here, appellant made a motion for directed verdict and a motion to dismiss at the close of the State's case, and both motions were denied. Although the abstract fails to evidence it, appellant proceeds, for at least forty pages in the record, to address the court. However, appellant did not present any evidence after the directed-verdict motion was made; hence, reliance on the motion is proper, and we reach the merits of appellant's argument.

■■ Motions for directed verdict are treated as challenges to the sufficiency of the evidence. *Burmingham v. State*, 342 Ark. 95, 27 S.W.3d 351 (2000); *Johnson v. State*, 71 Ark. App. 58, 25 S.W.3d 445 (2001). This review includes an evaluation of otherwise inadmissible evidence. *Id.* (citing *Harris v. State*, 284 Ark. 247, 681 S.W.2d 334 (1984)). When reviewing the denial of a directed verdict, the appellate court will look at the evidence in the light most favorable to the State, considering only the evidence that supports the judgment or verdict and will affirm if there is substantial evidence to support a verdict. *Johnson v. State, supra.* Evidence is sufficient to support a verdict if it is forceful enough to compel a conclusion one way or another. *Johnson v. State, supra.*

■■ The supreme court has held that the testimony of a rape victim satisfies the substantial-evidence requirement in a rape case. *Prater v. State*, 307 Ark. 180, 820 S.W.2d 429 (1991). The uncorroborated testimony of a rape victim is sufficient to support a conviction if the testimony satisfies the statutory elements. *Williams v. State*, 331 Ark. 263, 962 S.W.2d 329 (1998). However, circumstantial evidence must be consistent with the guilt of the defendant and inconsistent with any other reasonable conclusion. *Engram v. State*, 341 Ark. 196, 15 S.W.3d 678 (2000); *Sublett v. State*, 337 Ark. 374, 989 S.W.2d 910 (1999).

We defer to the jury's determination on the matter of witness credibility. *Johnson v. State, supra.* Jurors do not and need not view each fact in isolation, but rather may consider the evidence as a whole. *White v. State,* 47 Ark. App. 127, 886 S.W.2d 876 (1994). The jury is entitled to draw any reasonable inference from circumstantial evidence to the same extent that it can from direct evidence. *Id.* It is within the province of the jury to accept or reject testimony as it sees fit and inconsistencies in the testimony of a rape victim are matters of credibility for the jury to resolve. *Id.*

Here, the trial court denied all motions for a directed verdict and appellant was subsequently convicted by a jury of raping victim A.H., who was less that fourteen years of age. A person commits the offense of rape "if he engages in sexual intercourse or deviate sexual activity with another person who is incapable of consent because he is physically helpless or who is less than fourteen (14) years of age." Ark. Code Ann. § 5-14-103(a)(1)(B)(C)(i) (Supp. 2001). Deviate sexual behavior is defined as the penetration, however slight, of the labia majora or anus of one person by *any* body member of another person. Ark. Code Ann. § 5-14-101(1)(B) (Supp. 2001) (emphasis added). Physically helpless means that a person is unconscious or physically unable to communicate lack of consent or rendered unaware the sexual act is occurring. Ark. Code Ann. § 5-14-101(8)(A)(i)(ii)(B) (Supp. 2001).

To determine whether the trial court erred, it is necessary to review the trial testimony. First, A.H., the victim in the case, testified that she met appellant through her mother. He was her mother's co-worker. She testified that when she first met appellant, he was very kind and generous and acted "like he wanted to get to know me better." They would go to the movies and go shopping. She would go over to his house and play a lot of games and he would buy her "board games and stuff." She never remembered him taking her other sisters or brothers with them.

A.H. further testified that she would go to appellant's trailer, and while there, she would "watch tv and spend the night there playing the computer." Appellant would give her something to eat and drink, usually "for breakfast like eggs and bacon and toast and during lunch probably a sandwich and a coke." When asked whether she ever noticed anything unusual about the coke that he gave her, A.H. responded that "like the coke when you first drink it . . . it [tastes] fresh and it has a fizz to it, and later on when I came back from the bathroom and it didn't have a fizz to it. It tasted not like a coke. I drank it anyway. It happened more than once."

In addition to the foregoing, A.H. stated that appellant touched her "like at nighttime." When she was staying the night and watching television,

> I rolled over on my chest and he was at the headboard and he started touching me on the vagina area and with his foot, and rubbing back and forth, and asked me if it felt good and then he rolled me over on my chest and started feeling all over my chest. He used his hands to feel on my chest. And he was saying does it feel good. We were on the waterbed. He had touched me earlier that day. I was on the computer earlier that day, and I was playing games, and he come up behind me and started rubbing on my chest with his hands. . . . He was like rubbing in a circular motion. . . . Both times, I told him to stop and leave me alone. . . . He tried to penetrate me with his penis.

> He took his penis out of his pants and I saw it. He did not say anything to me while he was doing that. It made me feel scared and I told my sister. I did not tell my mom because I was scared of what she was going to do to me. I thought I was going to get in trouble. . . .

> I recognize his bed. It is in his living room. That is the table we used to sit at and eat sometimes when playing the Ouija board at that table. I recognize the red stripedy [sic] cover. I used to sleep with it all the time and be covered up in it. That is where I would sleep when I stayed the night over there. The defendant would sleep on the opposite side of the same waterbed.

> From the photo, I recognize my pajamas and my underwear. The underwear are white with 3D hearts on them. My grandma gave me the pajamas for my birthday and I wore them every night. I did wear them over at the defendant's trailer. I remember doing that. I don't remember being taped on a video camera. The police did find a videotape, but I have never seen that videotape.

On cross examination, A.H. testified that she was "pretty sure" that she is the person depicted in a photograph. She could not see her face, but she was "pretty sure" that it was her. She further testified that the coke made her "very sleepy."

Appellant's mother, K.S., testified for the State. She testified that she had five children, and appellant, her co-worker, lived in the neighborhood. He would offer to come over and cut grass. "He offered to take one of my daughters because he has a niece her age

to movies, bowling, skating, just different things, go carting. That was my daughter A.H. and he did not express a lot of interest in my other four children." She further stated that she allowed her daughter to spend the night at his trailer. She spent the night over there "thirty times in a year and a half. I never had any reason to think that I was not to trust him."

When shown a picture, K.S. testified that

> that's my daughter sleeping. I believe I saw [the photograph] when Detective Winchester showed it to me to identify my daughter and that is my daughter in that photograph. She looks about eight years old in that picture. Those are her pajamas that her grandmother had given her maybe for her sixth birthday. Those are her underwear also. They are white with designs on them, looks like hearts, pink, blue, and yellow.

> I do recall her owning that pair of underwear. She was probably eight years old when she wore that underwear and the same age when the pajamas fit her. She outgrew them and I gave them to Detective Winchester. Those are the pajamas. . . . She also outgrew the panties, but we threw those away.

Detective Winchester testified that when he saw the tape, the first thing he set out to do was "identify the victim." He obtained information from a witness, H.I., appellant's girlfriend. Based on the information she gave him, he was able to locate A.H. He further testified that

> H.I. took me out to the residence where [the victim] used to live. And then I was able to do some research and find out who used to live there. I made contact with her mother, the victim's mother, K.S. I showed her a still photo taken from that video to have her identify her daughter. . . . I showed her actual pictures taken from that tape. . . . After showing her those photographs, I received an item of clothing from A.H.'s mother. They were the pajamas that appeared to be the same as in the still photographs.

The jury was shown the video. The first scene in the video depicted a very disturbing picture of the appellant and a sleeping or otherwise unconscious young female. The female's face is not apparent from the video, however, she is wearing white pajamas with pink polka dots on them and colorful 3D heart underwear. She does not move in the scene, but only flinches once when appellant is shown engaging in deviate-sexual behavior. Appellant is

shown touching the labia majora of the female with his hand. He is also shown moving the pajamas and underwear to the side and penetrating her labia majora with his tongue. He then proceeds to penetrate the labia majora of the female with his penis.

As previously evidenced, victim A.H. testified that she owned pajamas with pink polka dots on them and colorful 3D heart underwear and wore them on some occasions at appellant's home. She further testified that appellant often gave her cokes that, after she returned from the bathroom, did not have a "fizz" to them and made her sleepy. She further testified that on several occasions, appellant had touched her chest with his hands and showed his penis to her and tried to penetrate her. She also testified that while at the opposite end of the bed as appellant, he took his foot and touched her vaginal area "rubbing back and forth."

Her mother K.S. testified that A.H. owned pajamas and underwear as described. The pajamas were given to a younger sibling of A.H. and the underwear were discarded. She relinquished the pajamas to Detective Winchester. Detective Winchester gave testimony that he received an item of clothing from A.H.'s mother that appeared to be the same as those shown in the video.

■ The foregoing testimony along with the video seized from appellant's home was presented to the jury. After reviewing the evidence in the light most favorable to the State, we have determined that there was substantial evidence to support appellant's conviction. Specifically, we hold that there was enough circumstantial evidence that was forceful enough to compel reasonable minds to reach a conclusion consistent with appellant's guilt and inconsistent with any other reasonable conclusion. The victim testified that appellant had, in previous instances, inappropriately touched her chest and vagina and attempted to penetrate her. We defer to the reasonable inferences of the jury who found enough circumstantial evidence to convict appellant of rape. Accordingly, the trial court's denial of appellant's motion for directed verdict is affirmed.

*Motion to Suppress*

Appellant next contends the trial court erred in denying his motion to suppress the evidence taken from his residence. He alleges that there was no reasonable cause to believe that Chrobak was the person who sent the images from a computer located in his mobile home because (1) FBI Special Agent Jill Hill, in her affidavit

and testimony, stated that she did not know if the person who registered the Internet address "Post@them.now" with Aristotle.net was appellant, and because (2) she did not present any evidence that the computer appellant allegedly used to transmit the pornographic images was located in the mobile home that was searched in October of 1998. Additionally, appellant alleges that there were no reports indicating that appellant transmitted or received pornographic images on occasions other than in July of 1998, and that this single transmission, ninety days before the search, was insufficient to establish probable cause to believe contraband was located in appellant's mobile home. We find appellant's arguments unpersuasive.

In reviewing a trial court's ruling on a motion to suppress, we make an independent determination based on the totality of the circumstances, viewing the evidence in a light most favorable to the State, and reverse only if the ruling is clearly against the preponderance of the evidence. *Johnson v. State, supra.*

The Fourth Amendment to the United States Constitution protects citizens against unreasonable search and seizure. It requires an issuing magistrate to

> simply make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed.

*Wyatt v. State,* 75 Ark. App. 1, 54 S.W.3d 549 (2001) (citing *Illinois v. Gates,* 462 U.S. 213 (1983)).

On October 26, 1998, FBI Agent Hill swore out an affidavit for a search warrant for appellant's mobile home at 4629G Old Tom Box Road in Jacksonville, Arkansas, wherein she stated that pursuant to a federal grand jury subpoena, law · enforcement officers learned that the account holder of Post@them.now was appellant. Hill testified that her job requires her to execute search warrants based on leads she receives from undercover agents who have gone online in an undercover capacity and have filmed people that are trafficking in child pornography over the Internet. That is what happened in this case.

█ In the affidavit for the search warrant, Hill stated that through her training, experience, and consultations with other law enforcement officers, she was "aware that individuals involved in the sexual exploitation of children through child pornography almost always keep copies of their sexually explicit materials, especially when they are used in the seduction of children." Hill further stated that due to the protection of passwords and other security devices, the "use of a computer to traffic, trade, and collect child pornography and hardcore sexually explicit pornography is a growing phenomenon," and that individuals involved in the collection and distribution of child pornography almost always maintain and possess their materials in a secure place, most often a residence, to avoid detection by law enforcement. Given her expertise, Hill believed that probable cause existed that computers and computer-related equipment, records and related documents pertaining to the production, receipt, transportation, possession, and distribution of child pornography were located within appellant's mobile home. The United States magistrate judge found that probable cause existed and issued the warrant. Our duty as the reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed, and in the case at hand, there was a substantial basis for the magistrate to reach that conclusion. *See Wyatt, supra.*

█ Citing *White v. State*, 47 Ark. App. 127, 886 S.W.2d 876 (1994), appellant also alleges that the information in the affidavit was stale, thus diminishing probable cause because (1) the information on him came from the New York Attorney General's Office, who intercepted four images from Post@them.now on July 27, 1998, and (2) the search warrant was not applied for until late October of 1998. *White v. State, supra.* However, the delay is not considered separately. Rather, the length of the delay is considered together with the nature of the unlawful activity and in the light of common sense. *Id.* (citing *Cardozo v. State*, 7 Ark. App. 219, 646 S.W.2d 705 (1983)).

█ Although not binding on this court, we find the decision of the Eighth Circuit Court of Appeals in *United States v. Rugh*, 968 F.2d (8th Cir. 1992) to be highly persuasive. In *Rugh*, the court stated that the delay in executing a search warrant does not always make probable cause fatally stale. Other factors must also be considered, including the nature of the criminal activity involved and the kind of property subject to search. *Id.* In that case, the court ultimately held that the continuous nature of an ongoing child-pornography ring and the tendency of pedophiles to retain child

pornography for a long period of time minimized the lapse of time between information in the affidavit and the execution of a search warrant.

Here, Hill stated that based on her experience, individuals who trade in child pornography "almost always" keep copies of their materials. The New York State Attorney General's Office intercepted the images transferred on July 27, 1998. It was later determined that the address from which the photos were sent belonged to an individual in Arkansas. Common sense tells us that the information would be disseminated to Arkansas officials and that these officials would not act hastily, but instead conduct their own investigation before proceeding further.

Even if it was determined that probable cause was diminished by the length of time between the New York Attorney General's interception of the pornographic images in July of 1998 and the issuance of a search warrant in late October of 1998, we would affirm the denial of appellant's motion to suppress on the good-faith exception to the exclusionary rule. The United States Supreme Court, in *United States v. Leon*, 468 U.S. 897 (1984), noted that the basis for the exclusionary rule was not "to deter objectively reasonable law enforcement activity." The Court went further to state:

> even assuming that the rule effectively deters some police misconduct and provides incentives for the law enforcement profession as a whole to conduct itself in accord with the Fourth Amendment, it cannot be expected, and should not be applied, to deter objectively reasonable law enforcement activity. "The deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least, negligent, conduct which has deprived the defendant of some right. By refusing to admit evidence gained as a result of such conduct, the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of an accused. Where the official action was pursued in complete good faith, however, the deterrence rationale loses much of its force." (Citation omitted.)

> "If the purpose of the exclusionary rule is to deter unlawful police conduct, then evidence obtained from a search should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the

search was unconstitutional under the Fourth Amendment." (Citations omitted.) In short, where the officer's conduct is objectively reasonable, "excluding the evidence will not further the ends of the exclusionary rule in any appreciable way; for it is painfully apparent that . . . the officer is acting as a reasonable officer would and should act in similar circumstances. Excluding the evidence can in no way affect his future conduct unless it is to make him less willing to do his duty." (Citation omitted.) This is particularly true, we believe, when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope. In most such cases, there is no police illegality and thus nothing to deter. It is the magistrate's responsibility to determine whether the officer's allegations establish probable cause and, if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment. In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient. "Once the warrant issues, there is literally nothing more the policeman can do in seeking to comply with the law."

468 U.S. 897 at 919-921 (1984) (citations omitted).

█ Here, the magistrate operated with full knowledge that the New York State Attorney General's Office intercepted the images on July 27, 1998, as Agent Hill's affidavit so stated. Thus, the magistrate was well aware of the circumstances when he issued the warrant in October of 1998. It was the magistrate's responsibility to determine whether Agent Hill's allegations established probable cause, and we find that the magistrate had a substantial basis for concluding that probable cause existed. The officers conducted a search incident to the execution of that warrant; therefore, any evidence the officers seized became the fruits of a seemingly valid search warrant.

We affirm.

VAUGHT, J., agrees.

PITTMAN, J., concurs.