Michael Shane DIGGS *v.* STATE of Arkansas

CA CR 05–392                            219 S.W.3d 654

Court of Appeals of Arkansas
Opinion delivered December 7, 2005

334

*Montgomery, Adams & Wyatt, PLC*, by: *Dale E. Adams*, for appellant.

*Mike Beebe*, Att'y Gen., by: *Clayton K. Hodges*, Ass't Att'y Gen., for appellee.

Robert J. Gladwin, Judge. Appellant Michael Shane Diggs was convicted by a Garland County jury of residential burglary and sentenced to eighteen years in the Arkansas Department of Correction. On appeal, he challenges the sufficiency of the evidence related to the conviction and argues that the trial court erred in denying his motion to enforce a plea offer made by the State, which was subsequently withdrawn. We affirm.

On or about October 27, 2003, Phyllis Johnson was alone in her home in rural Garland County, Arkansas. She retired to her bedroom at her usual time of approximately 11:15 p.m. As she

typically did, Ms. Johnson turned on the lamp and television in her bedroom, but soon thereafter, she experienced a power outage. This was a frequent occurrence in the area, so Ms. Johnson initially attempted to go to sleep without investigating the power outage.

After approximately fifteen or twenty minutes, Ms. Johnson heard knocking sounds at the door leading to her carport. She ignored it, but the knock repeated a short time later. Ms. Johnson got out of bed and walked to the living room to look outside for the source of the noise. She did not see anyone at the door when she looked through the window; however, she did notice that she was the only one on her block experiencing a power outage and that all of the street lights were operating normally.

It was at this time that Ms. Johnson became extremely frightened. As she walked back to her bedroom to retrieve her gun, she heard a voice outside the house in the front part of the garage. Next, when she reached her bedroom, she heard a heavy scratching sound above her, specifically a "long, drawn-out, shuffle, slide, dragging-type noise" in the attic that sounded too heavy to be an animal. In her frightened state, Ms. Johnson broke off the key of her gun's trigger lock in the lock, effectively rendering the gun useless to protect her. Her land-line phone would not operate without electricity, but Ms. Johnson remembered her mobile phone and used it to call 911. She remained on the line with the 911 dispatcher until Garland County Sheriff's Department officers arrived.

Corporal Scott West, one of the first officers to arrive, accompanied a shaken Ms. Johnson outside to survey the area. They noticed muddy footprints and small dents on the hood of her car and realized that the attic-access door, which was located just above the car, was open. Once other officers arrived, Officer West made his way up into the attic where he noticed what appeared to be a "trail" where someone had crawled through the insulation. At the end of the path, appellant was discovered lying between two floor joists under the insulation. He was wearing a black jacket, and when he initially put his hands up in the air at the direction of the officers, the officers noticed he was wearing latex or surgical-type gloves. Appellant quickly put his hands back under the insulation, prompting officers to order him to raise them again. When he did, the gloves were no longer on his hands. Subsequent to appellant being removed from the attic, Officer West returned to appellant's hiding place where he discovered the latex gloves

and a large, serrated kitchen knife. Ms. Johnson testified that she did not store knives in the attic and that the knife was not hers.

Deputy Ron Stone arrived at the scene later and stayed with Ms. Johnson while the other officers took appellant into custody. While Officer Stone and Ms. Johnson looked around the house to make sure the area was secure, they noticed that the breaker box had been opened and the power shut off. They flipped the switch, and the power was restored. Nevertheless, Ms. Johnson spent the remainder of the night with her son. The following day, she returned to the house with her daughter and discovered that the telephone lines had been pulled out of the box through which the line passes into her home.

Appellant explained to the officers that he had escaped from Robert Blackstead, who had kidnapped him, and that he had taken the knife from Blackstead's residence during his escape. He claimed that he was merely hiding from Blackstead in Ms. Johnson's attic and then asked to speak to a "Hot Springs drug agent."

Appellant was charged with residential burglary, specifically with entering or remaining unlawfully in a private residence with the purpose of committing assault in the third degree, an offense punishable by imprisonment. At the close of the State's case, the trial judge ordered a short recess. The parties and counsel met in chambers during the recess, at which time appellant moved for a directed verdict. The motion was denied, and appellant's counsel rested the defense's case without putting on any evidence. While appellant did not renew his motion for a directed verdict, as generally required by Rule 33.1(a) of the Arkansas Rules of Criminal Procedure, he was not required to do so, where, as here, he rested without presenting a case. *See Robinson v. State*, 317 Ark. 17, 875 S.W.2d 837 (1994); *Chrobak v. State*, 75 Ark. App. 281, 58 S.W.3d 387 (2001). The jury was instructed that, in order to find appellant guilty of residential burglary, they had to find that he intended to commit third-degree assault, which was defined as purposely creating apprehension of imminent physical injury in the victim. From his conviction on that charge, comes this appeal.

## I. Denial of Motion for Directed Verdict

We treat a motion for directed verdict as a challenge to the sufficiency of the evidence. *Williams v. State*, 363 Ark. 395, 214 S.W.3d 829 (2005). The test for determining the sufficiency of

the evidence is whether the verdict is supported by substantial evidence, direct or circumstantial. *Id.* Substantial evidence is evidence that is of sufficient certainty and precision to compel a conclusion one way or the other and pass beyond mere suspicion or conjecture. *Id.* On appeal, we view the evidence in the light most favorable to the State, considering only that evidence that supports the verdict. *Id.* Additionally, when reviewing a challenge to the sufficiency of the evidence, we consider all the evidence, including that which may have been inadmissible, in the light most favorable to the State. *Id.*

█ A person commits the offense of residential burglary if he "enters or remains unlawfully in a residential occupiable structure of another person with the purpose of committing therein any offense punishable by imprisonment." Ark. Code Ann. § 5-39-201(a)(1) (Repl. 1997). A person commits third-degree assault, which is punishable by up to thirty days' imprisonment, if he "purposely creates apprehension of imminent physical injury of another person." Ark. Code Ann. § 5-13-207(a) (Repl. 1997). Appellant maintains that the State failed to prove that he had the. *intent* to commit third-degree assault. With regard to a person's intent, the Arkansas Supreme Court has stated:

> A person's state of mind at the time of a crime is seldom apparent. One's intent or purpose, being a state of mind, can seldom be positively known to others, so it ordinarily cannot be shown by direct evidence, but may be inferred from the facts and circumstances shown in evidence. Since intent cannot be proven by direct evidence, members of the jury are allowed to draw upon their common knowledge and experience to infer it from the circumstances.

*Cummings v. State*, 353 Ark. 618, 110 S.W.3d 272 (2003). While appellant admits that he entered or remained unlawfully in Ms. Johnson's attic, he asserts that there is nothing else that can be said about his actions that indicates a certain intent. He concedes that Ms. Johnson was terrified, but maintains that no inference can be fairly drawn from her "state" that his purpose of going into the attic was to instill such an apprehension. He argued at trial, and continues to argue, that inferring the intent from the act of illegally entering or remaining, itself, is something that is strictly forbidden by the United States Constitution. *See Norton v. State*, 271 Ark. 451, 609 S.W.2d 1

(1980). He maintains that the following evidence against him is insufficient to infer the requisite intent: (1) entering and remaining in the attic; (2) the facts surrounding his arrest, including the possession of latex gloves and a serrated kitchen knife, and his statement that he escaped from his kidnapper, Robert Blackstead; (3) the breaker switch having been turned off, presumably by appellant; (4) the telephone wires having been pulled out of the outside box. He states that at the time the events that prompted Ms. Johnson to call the police occurred, she did not know that he had a knife in the attic, nor did she know that he had turned off her electricity by switching off the power or that he had pulled her telephone wires out of the box. All she knew is that someone was in the attic, and appellant maintains that that is not sufficient to sustain the conviction.

There was far more evidence presented to the trial court than that appellant merely entered the residence. There is evidence from which the fact finder could conclude that he took steps to hinder Ms. Johnson's ability to summon help by turning off the power and pulling out the phone lines. At a minimum, she knew that power was off only to her residence after noticing the rest of the houses on the block had power and the street lights were functioning properly. Secondly, appellant banged on her carport door and noisily crawled through her attic, which she could easily hear, and which could, and did, frighten her. She might not have known that appellant had a knife with him, but the fact that he had a potentially deadly weapon on his person could at least raise an inference that he intended to, at the very least, place her in fear for her physical well-being.

Appellant's argument that the State is required to prove that he was planning to do harm to Ms. Johnson if there had not been police intervention is misguided. Appellant was engaged in a deliberate course of conduct, which led to the natural consequence that Ms. Johnson was placed in imminent fear of bodily harm. The law presumes that it was his intent to do so. *See Dye v. State*, 70 Ark. App. 329, 333, 17 S.W.3d 505, 508 (2000). The State contends that the best evidence that appellant entered Ms. Johnson's home with the purpose of committing third-degree assault is the fact that he did in fact commit the offense when he entered and remained there. Substantial evidence exists to support the verdict; therefore, we affirm on this point.

## II. Denial of Motion to Enforce Plea Offer

At a pretrial hearing, appellant asked that a plea agreement agreed upon by the parties be enforced. The essence of the proposed agreement was that the State would reduce the charge to criminal attempt to commit burglary and recommend a sentence of three years',[1] which would also have resolved another pending charge of aggravated assault. Subsequent to appellant agreeing to the terms of the plea agreement and signing all the related documents, his counsel received a telephone call from the prosecuting attorney's office withdrawing the plea offer. The deputy prosecutor explained that he had assumed the victim, Ms. Johnson, had agreed to the plea agreement, but that his assumption had been incorrect. Also, his supervising attorney had declined to authorize the plea agreement. The deputy prosecutor explained that the plea offer could be withdrawn so long as appellant had not suffered any detriment and pointed out that the only detriment suffered so far was the lack of time to prepare for trial, because appellant had been planning on pleading guilty. In order to compensate for this issue, the State moved for a continuance, at its expense, in order to allow appellant adequate time to prepare for trial.

Appellant verbally moved the court to enforce the plea agreement, and the trial court denied it, holding that the guilty plea would not have been accepted by the trial court, anyway, if the victim did not go along with the agreement. Subsequently, appellant was allowed to file a formal written motion to enforce the plea agreement, setting out the following ways in which he was prejudiced by the rescission of the offer:

(1) The plea offer was to reduce the charge from a Class B to a Class C felony, and if he were to be tried for the original burglary charge, it would have a maximum sentence in excess of the three years he had bargained for;

(2) If convicted of the original residential burglary charge, appellant would be classified as a habitual offender when he faced the other pending aggravated assault charge;

(3) A conviction of residential burglary would be a second conviction for appellant, which would automatically enhance the amount of time he would serve before being eligible for parole;

---

[1] There is some discrepancy as to whether it was for probation or prison time.

(4) He would still be required to face the other pending aggravated assault charge, and if convicted, he would in all probability receive a sentence consecutive to the sentence assessed in this matter.

All parties agreed that the motion did not become ripe unless and until appellant had been convicted and suffered a sentence more severe than he had bargained for under the proposed plea agreement, and further agreed that the motion should be reviewed after the completion of the trial in this matter. It was so heard, and the trial court once again denied appellant's motion.

■ Appellant acknowledges that the Arkansas Supreme Court stated in *Caldwell v. State*, 295 Ark. 149, 747 S.W.2d 99 (1988), that parties have no power to bind the trial court and that it is "illusory to say that the state is bound by such an agreement before it is consummated by the acceptance of a guilty plea by the [trial] court." *Caldwell*, 295 Ark. at 152, 747 S.W.2d at 101. He relies, however, on *Santobello v. New York*, 404 U.S. 257 (1971), which states that when a criminal defendant's inducement to enter a plea of guilty is a promise or agreement of the prosecutor, that promise must be fulfilled. He maintains that in *Caldwell*, *supra*, the Arkansas Supreme Court left open an avenue of relief related to the *Santobello* holding that has not been previously dealt with, as the cases that have addressed this issue have focused on the incorrect issue. Appellant asserts that the issue should not be whether the trial court accepts the guilty plea, but rather whether the prosecution bargains in good faith with the defense when it proposes the guilty plea agreement. He argues that, in his case, members of the prosecuting attorney's office were acting "without knowledge of the ultimate decision makers." That was not his fault, and he contends that it was a denial of due process to deprive him of the benefits of that plea agreement because of the errors of attorneys for the State who did not represent him.

■ *Santobello, supra*, is distinguishable in that there, the defendant had entered a plea to a reduced charge, and the trial court set the matter for sentencing at a later date. Here, the guilty plea had not been accepted or entered, accordingly, appellant had not suffered judgment for an offense. Likewise, in *Caldwell*, the prosecutor made the defendant a plea offer whereby the prosecutor would recommend a probationary sentence in exchange for his guilty plea. Prior to the parties appearing in court, a new prosecutor took over and rescinded the plea offer. The motion to enforce

the plea offer was denied, and the Arkansas Supreme Court affirmed, distinguishing situations of where plea offers have been entered from those where they have not. Because the defendant could not show other detrimental reliance, beyond merely accepting the plea offer, he was not entitled to enforce it.

■ Appellant's four alleged points of "detrimental reliance" are illusory. All of the facts he asserts would have occurred if, and only if, the trial court had accepted the plea agreement, which it stated it would not have done because of the victim's objection to the agreement. Additionally, the supreme court in *Caldwell* suggested that, in a case in which an accused detrimentally relies on a withdrawn plea offer, the withdrawal may affect only the evidence available to the prosecution. *Caldwell*, 295 Ark. at 152, 747 S.W.2d at 101. Pursuant to *Caldwell*, a defendant is required to show more than the mere fact that he desired the concessions contemplated by the withdrawn plea offer, and even if he does show it, the appropriate remedy would seem to be to withdraw the guilty plea and limit to some extent the prosecution's evidence in the matter. Here, appellant failed to prove detrimental reliance, and accordingly, we affirm on this point as well.

Affirmed.

PITTMAN, C.J., and HART, J., agree.