2010 Ark. App. 85

**Connie WATKINS, Appellant**

v.

**STATE of Arkansas, Appellee.**

**No. CA CR 08–1285.**

Court of Appeals of Arkansas.

Jan. 27, 2010.

Rehearing Denied March 3, 2010.

Connie Watkins, pro se.

Dustin McDaniel, Atty. Gen., Brad Newman, Asst. Atty. Gen., for appellee.

DAVID M. GLOVER, Judge.

This case comes to us by appellant, Connie Watkins, who was convicted in a bench trial in Greene County Circuit Court of misdemeanor disorderly conduct and fined $100 after a de novo appeal from a conviction in district court. Watkins's arrest stemmed from events occurring soon after Paragould police officers Jaree Johnson and Mike Tinnin arrived at Watkins's house on the morning of November 28, 2006, in response to a request from Paragould Light, Water, and Cable for a civil standby for Crafton Tree Service to trim the trees along the electric lines. Watkins was represented by counsel at trial, but she is prosecuting this appeal pro se. She presents three arguments on appeal:

A. The Appellant's arrest was unlawful when she was arrested against her will, without a warrant or probable cause, when no warning was given, when there was no indication of criminal activity on her part before arrest, according to official police records, in violation of the Fourth Amendment to the Constitution which protects the right of the people to be secure in their persons . . . against unreasonable searches and seizures.

B. Procedural guarantees of 5th, 6th, and 14th amendments and similar guarantees of the Arkansas Constitution were violated on every issue including: the right to a speedy trial; to be informed of the nature of the accusations, the right for pre-hearings; the right for a jury trial that is to be waived only in the right manner; the right of a jury trial in light of governmental oppression; the right to be present for critical hearings; the right to have the assistance of counsel for defense; the right of the accused to be confronted with the witnesses against her; and the right to have compulsory process for obtaining witnesses in her favor.

C. Appellant's convictions for "disorderly conduct" was so totally devoid of evidentiary support as to be invalid under the Due Process Clause of the Fourteenth Amendment.

We affirm Watkins's conviction.

Although appellant's sufficiency-of-the-evidence argument is listed as her third argument, because of our prohibition against double jeopardy, we review the sufficiency of the evidence prior to examining trial error. *Chrobak v. State*, 75 Ark. App. 281, 58 S.W.3d 387 (2001). When the sufficiency of the evidence to support a criminal conviction is challenged on appeal, we review the evidence in the light most favorable to the State and affirm if the verdict is supported by substantial evidence. *Johnson v. State*, 343 Ark. 343, 37 S.W.3d 191 (2001). Substantial evidence is evidence that is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other, without resort to speculation or conjecture. *Id.*

Arkansas Code Annotated section 5–71–207(a) (Repl.2006) provides, in pertinent part:

A person commits the offense of disorderly conduct if, with the purpose to cause public inconvenience, annoyance, or alarm or recklessly creating a risk of public inconvenience, annoyance, or alarm, he or she:

(1) Engages in fighting or in violent, threatening, or tumultuous behavior;

(2) Makes unreasonable or excessive noise; [or]

(3) In a public place, uses abusive or obscene language, or makes an obscene gesture, in a manner likely to provoke a violent or disorderly response.

The two police officers and a representative of the tree service testified for the State; Watkins and her husband testified for the defense.[1] Officer Jaree Johnson testified that there was a road going into the field behind Watkins's house; that she pulled up to the area where Officer Tinnin's car and PLWC's truck were located; that Watkins came out of her house and through an opening in a wire fence that separated her property from the field; and that Watkins told her that PLWC did not have the right to trim the trees. Johnson said that when she walked over to Watkins, Watkins was suddenly gone and "chaos erupted."

Johnson testified that Watkins was mad, which was evidenced by her demeanor, facial expressions, and tone of voice; that Watkins was going from person to person yelling; and that keeping up with Watkins was difficult. According to Johnson, all of her attempts to calm Watkins down and rationalize with her were unsuccessful, even after Watkins was made aware that she could be arrested. Johnson said that she heard Watkins say "shit." According to Johnson, she saw Watkins approach one of the tree trimmers very quickly and yell at him, causing him to drop the orange cone he was holding and step back; after the tree-trimming crew had placed the cones in the work area, Watkins continued to enter that area, leaving only to go yell at one of the tree trimmers, but returning into the coned-off area. Johnson said that Watkins's movements toward her intimi-

---

1. While there was an audiotape from the officers' lapel microphones, much of the recorded information was unintelligible. Furthermore, from the record, it appears there were further events that occurred that were not recorded, as evidenced by the testimony provided at trial. With the benefit of the audiotape evidence, the trial court elected to credit the testimony of the State's witnesses at trial, which is within the trial court's province as finder of fact. *Palmer v. State*, 60 Ark.App. 97, 959 S.W.2d 420 (1998).

dated her because Watkins was so rage-filled.

Officer Mike Tinnin testified that the morning of November 28 was the first time he had met Watkins; that he saw Watkins's husband out front when he arrived; that he continued on to the back, where there was an open field; that individuals from the tree service were already there when he arrived; and that an individual from PLWC handed him paperwork, told him that they were going to be cutting the trees, and informed him of prior problems they had experienced with Watkins. Tinnin said that Watkins came out while he was talking to the individual from PLWC; that he asked her to point out her property line; that the trees were behind her property line in the field; that he tried to talk to her and reason with her but she did not calm down and remained visibly angry, as evidenced by her tone of voice, facial expressions, stance, posture, and "the way she would walk toward people"; and that she was upset and got loud and boisterous with individuals from the tree service and PLWC. He stated that the more he tried to remove Watkins from the work-safety zone, the more aggravated Watkins became, and it escalated to a point where he told Johnson that they needed to get Watkins out of there. Tinnin said that there was a lot of yelling and "a little bit of cussing," saying that he heard the "F" word and "bastard" being used, and that Watkins yelled at the employees of the tree service that they were murderers because they were murdering her trees. Tinnin said that he kept trying to get Watkins out of the work-safety area but that she would not follow his instructions; he warned Watkins that she could be arrested, but she did not calm down after that warning. Tinnin said that if Watkins had just walked away and gone back to her house, he would have been happy and would have just let her go; he said that he did not want to arrest her and was trying to get her to go back to her house, but she refused to go. He testified that he took into consideration Watkins's physical actions that morning—her aggressiveness, her facial expressions, her stances, the way she rushed at people—and said that he did not know what she might do, that if she was agitated enough "it could come to blows," and that was what he was there to prevent.

Jake Crafton, the operations manager and vice president of Crafton Tree Service, testified that on the day in question, his crew was located on property adjacent to Watkins's property, and they coned off the work site and proceeded to work on the trees located on the property behind Watkins's house. Crafton said that Watkins came out of the house after they pulled up; approached a city utility employee first; and then came over to where his crew was located and began yelling and cussing at his employees and anyone else around, saying, "you f* * *n' tree trimmers you're butchering my trees" in a loud confrontational manner, yelling right in his face. Crafton described Watkins as irate and "acting hysterical"; that he felt like she was threatening him; that he was intimidated by her actions; and that he was concerned for the well-being of his employees. He said that Watkins screamed at his crew, calling them "bastards" and yelling, "f* * *n' tree trimmers, quit doin' that," and that she charged at him as well as some of his workers in a speedy manner. He said that Watkins continued to enter the coned safety zone on several occasions, he asked the police to escort her out of the area, and he did not try to calm Watkins down because there was no rationalizing with her, that she was "going ballistic."

The State rested after Crafton's testimony, and Watkins's attorney presented a lengthy directed-verdict motion, which was

denied. Both Watkins and her husband then testified, basically disputing the officers' and Crafton's version of events. At the close of all the evidence, Watkins's attorney renewed the directed-verdict motion, which was denied.

In finding Watkins guilty of disorderly conduct, the trial court found that Watkins made personal attacks, called employees of the tree service "bastards" and "f* * *n' tree trimmers," used the "F" word, and yelled, screamed, and cussed at the owner of the tree service and his employees. The trial court found that Watkins's conduct was threatening and raised concerns about whether the confrontation "would come to blows." The trial court noted that the tree-service manager testified that he was threatened and intimidated by Watkins's actions and concerned for his employees because of Watkins's confrontational, irate, and hysterical behavior, and that Officer Johnson described Watkins as being in a constant state of rage and never calming down, with a rage-filled face, tone, and manner. The trial court observed Officer Tinnin's description of Watkins as loud, aggravated, and visibly angry, as evidenced by her tone of voice, facial expressions, and posture; the way Watkins would "rush" at people; and that when Tinnin attempted to get Watkins out of the safety zone, Watkins kept coming back and yelling, and would not follow instructions to stay out of the safety zone. The trial court found Officers Johnson and Tinnin and Jake Crafton to be credible, while finding the credibility of Watkins and her husband to be suspect and inconsistent.

### Sufficiency of the Evidence

Watkins's sufficiency argument, while styled as being "so totally devoid of evidentiary support as to be invalid under the due-process clause of the Fourteenth Amendment," was presented in three parts: that the State's witnesses gave "perjured" and false testimony that was inconsistent and that the trial judge was clearly erroneous in her evaluation of the credibility of the witnesses; that "the statute of Disorderly Conduct was used in bad faith" in her arrest; and that her conviction was invalid based upon the First Amendment.

#### a. Witness Credibility; Inconsistencies in Testimony

With regard to the credibility of witnesses and inconsistencies in witness testimony, it is the province of the trial court, not the appellate court, to evaluate witness credibility and to resolve any conflicts in the evidence. Resolution of conflicts in testimony and assessment of witness credibility is for the finder of fact. *Loy v. State*, 88 Ark.App. 91, 195 S.W.3d 370 (2004). In this case, the trial court, as the finder of fact, found the testimony of the State's witnesses to be more credible than the testimony of Watkins and her husband and resolved any conflicts in the testimony in the State's favor; this court is bound by these determinations.

#### b. Bad Faith

Watkins argues that the disorderly conduct statute was used in bad faith to punish her and discourage her in the exercise of her constitutionally protected rights. Watkins did not make this argument to the trial court; therefore, it is not preserved for appeal. Arguments not raised in the trial court, even ones of a constitutional nature, will not be addressed for the first time on appeal. *Buford v. State*, 368 Ark. 87, 243 S.W.3d 300 (2006).

#### c. First Amendment Challenge

Watkins argues that her conviction was invalid based upon the First Amendment. While this challenge could have

been more artfully formed, it is evident that Watkins is arguing that her conviction for disorderly conduct violates her right to free speech under the First Amendment. As noted earlier, Watkins's attorney made a lengthy directed-verdict motion. Her trial counsel's motion included the argument that the First Amendment protects a significant amount of verbal criticism toward police officers and that what was said by Watkins did not amount to "fighting words."

■ The trial court, by its comments from the bench, appears to have convicted Watkins under Arkansas Code Annotated section 5–71–207(a)(3), which provides that a person commits disorderly conduct when, with the purpose of causing public inconvenience, annoyance, or alarm, in a public place, she uses abusive or obscene language, or makes an obscene gesture, in a manner likely to provoke a violent or disorderly response. "The right of free speech is not absolute at all times and under all circumstances." *Bailey v. State*, 334 Ark. 43, 52, 972 S.W.2d 239, 244 (1998) (citing *Chaplinsky v. New Hampshire*, 315 U.S. 568, |₉571, 62 S.Ct. 766, 86 L.Ed. 1031 (1942)). In *Johnson, supra*, our supreme court held that subsection (a)(3) proscribes only "fighting words" in compliance with *Chaplinsky*, in which the test for determining whether language fell within this proscription was set forth as "what men of common intelligence would understand would be words likely to cause an average addressee to fight." *Chaplinsky*, 315 U.S. at 573, 62 S.Ct. 766.

We find the facts of *Johnson* support Watkins's conviction. Police approached Johnson, who was pacing and acting nervously, on a street corner, and when asked his name, Johnson responded, "Why are you f* * * harassing me?" Johnson, with whom officers had previous contact, then began flailing his arms, clenching his fists, and pulling off his shirt. Johnson was arrested for disorderly conduct after he walked to a nearby carport, would not leave, sprinted across the front porch, and wrapped his arms around the railing, refusing to leave. In finding sufficient evidence to support Johnson's disorderly conduct conviction, the supreme court held that the evidence indicated that Johnson alternated between states of calm and irrationality, and that he was flailing his arms, cursing loudly, and eventually demonstrating a violent demeanor.

Here, although police had not had previous encounters with Watkins, she became and remained irrational, even after being told that she could be arrested; she cursed the officers and tree-service employees; and she aggressively ran from person to person confronting them, both inside and outside the designated work zone. Furthermore, there was testimony from Crafton that he was intimidated by her and was concerned for the well being of his employees; Officer Johnson also testified that she was intimidated by Watkins. Considering |₁₀Watkins's language with the totality of her actions, we hold, as our supreme court found in *Johnson*, that there is sufficient evidence to uphold Watkins's conviction for disorderly conduct.

*Legality of Arrest/Constitutional Violations*

Watkins's remaining points, the legality of her arrest and several alleged constitutional violations, are not preserved for appeal because Watkins never made those arguments below. Again, arguments not raised in the trial court, even ones of a constitutional nature, will not be addressed for the first time on appeal. *Buford, supra*.

Affirmed.

VAUGHT, C.J., and PITTMAN, GLADWIN, and MARSHALL, JJ., agree.

HART, J., dissents.

HART, J., dissenting.

I dissent for two reasons. First, I believe that the majority opinion completely ignores all of our jurisprudence concerning appellate-issue preservation. Secondly, I simply cannot accept what the majority has, perhaps·unwittingly, done to our civil liberties.

This case involves a pro se appellant challenging her conviction for disorderly conduct that occurred on her own property and as a result of her attempt to get the police to stop a tree service hired by the Paragould Electric Company from destroying her trees. There are three points raised on appeal, and I agree that the majority was correct when it found that two of these points are clearly not preserved for appellate review. I cannot explain why they believe that the third point, which is ostensibly a challenge to the sufficiency of the evidence, was not similarly barred.

There can be no dispute that Ms. Watkins's trial counsel preserved a challenge to the sufficiency of the evidence in the trial court by the most thorough motion to dismiss that I can recall seeing in all the cases I have reviewed on this court. However, while the motion to dismiss, made by an experienced criminal-defense lawyer, was nearly perfect, the argument on appeal, made by a pro se appellant was very far from perfect. Indeed, try as I might, I could not find where the appellant made any argument that tracked any of the elements of the offense. Accordingly, Ms. Watkins changed her argument on appeal,

and we should have treated this case the very same way we have treated literally hundreds of other cases where the appellant has raised an argument on appeal that was different from the argument that he or she made to the trial court and refused to reach the merits. I submit that it is our constitutional duty to treat all litigants equally.

However, while it would be bad enough that the majority has ignored our preservation jurisprudence, the decision on the merits is simply appalling. Today's opinion has criminalized "body language," uttering a sibilant expletive—the woman said Shit!—and walking on a person's own property when another party sets out orange cones marking an invisible line, even though that other party may be trespassing.

Moreover, I cannot ignore the fact that this case involved a warrantless misdemeanor arrest. That means that the act complained of had to be committed in the presence of the arresting officer. Ark. R.Crim. P. 4(a)(iii); Ark.Code Ann. § 16–81–106(c)(1) (Repl.2005). Further, this case is unusual in that the arresting officer made an audio recording of everything that transpired. The majority had not only the tape itself, but a complete transcript. Yet, the majority credits, and quotes at length, testimony that was belied by the audio tape and conduct that was not observed by the arresting officer.[2]

---

**2.** The majority's ·contention that the audiotape was "unintelligible" is misguided. This assertion is belied by the fact that the State was able to produce a transcript of her remarks.

While there is some background noise on the tape, Ms. Watkins remarks are clear. I concede that great deference is given to the trial court's determination of a witness's credibili-

ty, that deference is not absolute. The supreme court has stated that it will not rely on testimony that is "inherently improbable, physically impossible, or so clearly unbelievable that reasonable minds could not differ thereon." *Brown v. State,* 374 Ark. 341, 288 S.W.3d 226 (2008). When testimony diverges from what is recorded, as it does here, it is at least "inherently improbable," if not "so clearly unbelievable that reasonable minds could not differ."