M.J., a Minor, Appellant

v.

STATE of Arkansas, Appellee.

No. CA 10–724.

Court of Appeals of Arkansas.

March 2, 2011.

Rehearing Denied April 13, 2011.

Terry Goodwin Jones, Jonesboro, for appellant.

Dustin McDaniel, Atty. Gen., Karen Virginia Wallace, Asst. Atty. Gen., for appellee.

DAVID M. GLOVER, Judge.

Appellant, M.J., was charged as a juvenile with disorderly conduct. Following a hearing, the juvenile judge adjudicated him delinquent.[1] As his sole point of appeal, he contends that the trial court erred in denying his motion for a directed verdict, specifically because the State failed to prove that he had either recklessly or intentionally committed disorderly conduct. Finding merit in his argument, we reverse.

*Hearing Testimony*

Lewis Davis testified that he works for the juvenile office in Craighead County and also as a resource officer at the Success School. He described the contact that he had with appellant and his family

---

1. His probation on an earlier offense was also revoked during this proceeding, but appellant raises no points of appeal with respect to the revocation.

on March 11, 2010. Davis was walking down the street at the time school was dismissed on that date, around 3:15 p.m., when he saw appellant's mother, Shamika Jenkins, in a car with her daughter Shanquawala. With knowledge there was an outstanding juvenile-arrest warrant for Shanquawala, he approached the car and instructed Shanquawala to get out of the car because she was under arrest. Shamika stopped her daughter from getting out of the car and drove off to thwart the arrest.

Davis explained that he called an officer on his cell phone; told him what had happened; and asked him to report a description of the vehicle to dispatch. Soon thereafter, approximately ten minutes, Shamika called Davis and told him she was on her way back with Shanquawala, but before she arrived, Officer Kerry Varner spotted her vehicle and pulled her over approximately thirty feet away from the school's parking lot. Davis stated that Varner placed Shanquawala under arrest, and was in the process of arresting Shamika for hindering arrest, when appellant began running toward them. Appellant saw his mother being handcuffed and yelled, "Get your hands off my mother." Appellant was yelling in a very loud voice, and Davis said he heard appellant before he actually saw him. Davis did not remember appellant having clenched hands but appellant had "a look of fear or frustration." According to Davis, he stopped appellant when appellant got close to him because he was afraid appellant would try to interfere with his mother's arrest. He told appellant to lower his voice, that he did not need to get involved, and that he did not want to arrest appellant for disorderly conduct. Then, appellant started yelling for the officer to get his "fucking" hands off his mother and that the situation was "fucked up." Davis said that the incident went on for about twenty seconds,

during which time he had his hands on appellant, and that appellant was jumping up and down. He could not say that appellant was trying to actively get past him.

Davis explained that the incident with appellant took place on the sidewalk in the residential area, next to a public street very close to the entrance of the Success School. He stated that there was "quite a bit of backed up traffic." A utility detail was working nearby and there were "quite a few children around." Davis testified that appellant did not quiet down until he got into a patrol car. Three units were present and another officer put appellant into the patrol car for Davis. Davis said that appellant was not cussing him, just cussing, and that he did that "about four or five times."

On cross-examination, Davis testified that he believed appellant was extremely concerned about his mother and protective of his mother; that appellant's protective nature is a good trait, which is why Davis wanted to de-escalate the problem; that it was just speculation on Davis's part that appellant was going to interfere with the arrest; and that Davis himself did not think Shamika was being harmed.

Officer Caleb Landreth testified that he was called to the scene of the March 11 incident involving appellant because the mother had fled with her daughter. He explained that he had been notified by the resource officer, then radioed area units, and other officers had stopped the mother's car at the corner of Drake and Hoover. Landreth became aware of appellant when he started yelling and cussing him for arresting the mother. According to Landreth, appellant was about twenty to thirty yards away when he started yelling, "Get your fucking hands off my mom. You don't have to grab her like that."

Landreth stated that the resource officer grabbed appellant and stopped him from advancing toward Landreth but that appellant continued to yell while the resource officer was directing him to be quiet and to stop. There were construction workers in the area and "traffic had piled up *because of the stop* <u>*and*</u> *the construction* so we had cars all around with the school kids and the parents who were there to pick up their kids." (Emphasis added.)

At the conclusion of the State's case, appellant moved for a directed verdict. The trial court denied the motion.

Shamika Jenkins testified, essentially denying that appellant did any cussing. Similarly, his sister, Shanquawala, testified that she did not see appellant being unruly or disorderly before he was arrested. Crishana Staley, a family friend, testified that she observed the incident and heard the resource officer say "it would be a family affair" as he was arresting appellant.

Appellant testified that he was fifteen years old; that his main concern during the incident was his mother; that they were "manhandling" her; that he knew his sister had a warrant but did not know why they were arresting his mother; that he was very worried about that; and that he "was only yelling when I was trying to get someone to answer me about why my mother was being arrested." He denied cussing Davis or any of the other officers—at least prior to his arrest.

Appellant again moved for a directed verdict after resting his case, which was also denied.

### Standard of Review

■ The standard of review for sufficiency of the evidence in a juvenile proceeding is the same as in a criminal case. *R.W. v. State*, 2010 Ark. App. 220, 2010 WL 724310. In reviewing a juvenile-delinquency case, we look at the record in the light most favorable to the State to determine whether there is substantial evidence to support the conviction. *Id.* Substantial evidence is evidence of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other, without mere speculation or conjecture. *Id.* In determining whether there is substantial evidence, we only consider that evidence tending to support the verdict, and we do not weigh the evidence presented at trial, as that is the responsibility of the finder of fact. *Id.*

### Disorderly conduct

Arkansas Code Annotated section 5–71–207 (Supp.2009) provides:

Disorderly conduct.

(a) A person commits the offense of disorderly conduct if, *with the purpose* to cause public inconvenience, annoyance, or alarm *or recklessly* creating a risk of public inconvenience, annoyance, or alarm, he or she:

(1) Engages in fighting or in violent, threatening, or tumultuous behavior;

(2) Makes unreasonable or excessive noise;

(3) In a public place, uses abusive or obscene language, or makes an obscene gesture, in a manner likely to provoke a violent or disorderly response;

(4) Disrupts or disturbs any lawful assembly or meeting of persons;

(5) Obstructs vehicular or pedestrian traffic;

(6) Congregates with two (2) or more other persons in a public place and refuses to comply with a lawful order to disperse of a law enforcement officer or other person engaged in enforcing or executing the law;

(7) Creates a hazardous or physically offensive condition;

(8) In a public place, mars, defiles, desecrates, or otherwise damages a patriotic or religious symbol that is an object of respect by the public or a substantial segment of the public; or

(9) In a public place, exposes his or her private parts.

(Emphasis added.) [2]

### Mental State

Appellant contends that the trial court erred in denying his motion for a directed verdict because the State failed to prove that he either recklessly or intentionally committed the offense of disorderly conduct. That is, he argues that the State failed to prove that he had the requisite mental state to commit the offense of disorderly conduct. We agree.

Arkansas Code Annotated section 5–2–202 (Repl.2006) defines "purposely" and "recklessly" as follows:

5–2–202. Culpable mental states—Definitions.

As used in the Arkansas Criminal Code, there are four (4) kinds of culpable mental states that are defined as follows:

(1) "PURPOSELY." A person acts purposely with respect to his or her conduct or a result of his or her conduct *when it is the person's conscious object to engage in conduct of that nature or to cause the result;*

. . . .

(3) "RECKLESSLY."

(A) A person acts recklessly with respect to attendant circumstances or a result of his or her conduct when the person *consciously disregards a substantial and unjustifiable risk that the attendant circumstances exist or the result will occur.*

(B) *The risk must be of a nature and degree that disregard of the risk constitutes a gross deviation from the standard of care that a reasonable person would observe in the actor's situation[.]*

(Emphasis added.) As a result of the difficulty in ascertaining an actor's state of mind, a presumption exists that a person intends the natural and probable consequences of his or her acts. *Warden v. State,* 2011 Ark. App. 75, 381 S.W.3d 140. The fact-finder may draw upon common knowledge and experience to infer the defendant's intent from the circumstances. *Id.*

Here, the evidence—viewed most favorably to the State—showed that appellant is fifteen years old; that he unexpectedly came upon the scene where his mother was being arrested and handcuffed; that he had a "look of fear or frustration" but no clenched hands; that he yelled in a very loud voice, "Get your fucking hands off my mother" and that the situation was "fucked up"; that the resource officer put his hands on appellant, who was jumping up and down, and told appellant to lower his voice because he did not need to get involved; that the resource officer could not say appellant was trying to actively get past him; that the incident occurred on a public street, close to the school entrance, in a residential area, with children around, and a utility crew nearby, all caus-

---

2. For general discussions concerning the contours of "disorderly conduct" and the tension between freedom of speech and the offense, *see generally Johnson v. State,* 343 Ark. 343, 37 S.W.3d 191 (2001); *Watkins v. State,* 2010 Ark. App. 85, 377 S.W.3d 286. *See also, Hammond v. Adkisson,* 536 F.2d 237 (8th Cir. 1976) for historical perspective, explaining that the use of abusive and profane words is not sufficient by itself to constitute disorderly conduct; the words must be likely to incite a violent reaction, and the circumstances of their utterance are important.

ing backed-up traffic; and that the incident lasted about twenty seconds. The evidence establishes the use of foul language, but no demonstration of violent demeanor or acts of aggression.

Under the facts of this case, we have concluded that the evidence did not establish that appellant engaged in purposeful conduct. That is, the evidence does not support the conclusion that it was his *conscious object* to engage in disorderly conduct as defined in section 5–71–207. We have wrestled more with whether the State established that appellant acted "recklessly," again concluding that, under the facts presented, the evidence does not support that state of mind for appellant either.

A "person acts recklessly with respect to attendant circumstances or a result of his or her conduct when the person *consciously disregards a substantial and unjustifiable risk that the attendant circumstances exist or the result will occur*" (emphasis added), *i.e.,* that disorderly conduct will occur. Ark.Code Ann. § 5–2–202. *And, "[t]he risk must be of a nature and degree that disregard of the risk constitutes a gross deviation from the standard of care that a reasonable person would observe in the actor's situation[.]*" (Emphasis added.) *Id.* Twenty seconds of the described conduct—by a fifteen-year-old boy whose mother was being unexpectedly handcuffed in front of him—does not constitute a "gross deviation from the standard of care that a reasonable person would observe" in his situation.

Reversed.

ABRAMSON and HOOFMAN, JJ., agree.